Albert C. PERBAL and Martha L. Perbal,
Appellants-Respondents,

v.

DAZOR MANUFACTURING CORP., a Corporation, Appellant-Respondent,
and

Percy L. Read, Respondent.

No. 53029.

Supreme Court of Missouri,

Division No. 2.

Dec. 31, 1968.

Motion for Rehearing or to Transfer to the Court En Banc Denied Feb. 10, 1969.

678

Morris E. Stokes and Jerome A. Gross and Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for plaintiffs-appellants.

R. H. McRoberts, Marion S. Francis, St. Louis, for defendants-respondents.

Bryan, Cave, McPheeters & McRoberts, St. Louis, of counsel.

STOCKARD, Commissioner.

By four counts of their petition plaintiffs, as owners of certain patents, sought royalties alleged to be due under licensing agreements on items or devices manufactured and sold by Dazor Manufacturing Corp. and its predecessors. In a fifth count plaintiffs sought to hold defendant Percy L. Read

personally liable for the royalties. Judgment in excess of $559,000 was entered in favor of plaintiffs on Counts I, III and IV, and Dazor Manufacturing Corp. has appealed. Judgment was entered for defendants on Counts II and V, and plaintiffs have appealed.

Dazor Manufacturing Corp. was incorporated March 2, 1938, with plaintiff Albert C. Perbal and Harry L. Dazey as two of its incorporators. Mr. Perbal was a director and also was secretary-treasurer. On March 1, 1941, Mr. Perbal surrendered all of his interest in the corporation, it was dissolved, and its assets transferred to Harry L. Dazey, the then sole stockholder. Defendant Percy L. Read, a partner in an accounting firm formerly employed by Dazor Manufacturing Corp., acquired one half of the business and became a partner of Mr. Dazey. In February 1946, Mr. Read purchased the interest of Mr. Dazey, and the business was then incorporated under the name of Dazor Manufacturing Corp. with Mr. Read as the sole stockholder. We shall hereafter refer to the above described business enterprises as "Dazor" without regard to the form of ownership.

Mr. Perbal applied for and on May 14, 1940 was granted a patent (No. 2,200,518) on what is described as an adjustable bracket structure (hereafter referred to as an "adjustable bracket"), a device which permitted movability of an arm used on desk lamps and other items. With Mr. Perbal's permission this patented device was manufactured by Dazor and incorporated into its products. On August 31, 1940, at a time prior to the acquisition by Mr. Read of any interest in Dazor, Mr. Perbal and Dazor entered into a license agreement which, excluding recitals and provisions immaterial to the issues herein, was as follows:

"(1) Perbal hereby grants to Dazor the exclusive and universal right and license to manufacture and sell lamps and other devices embodying the invention described and claimed in patent No. 2,200,518 for the full life of said patent, unless this grant is otherwise terminated as hereinafter provided.

"(2) Perbal agrees that Dazor shall have the exclusive and universal right to manufacture and sell lamps and other devices embodying any improvements on the invention aforesaid, and this License Agreement shall extend to and include any patent or patents which may hereafter issue to him on such improvements, even though such improvements may not, at the time of this Agreement, have been conceived by him.

"(3) Dazor agrees to pay Perbal royalties equal to five (5%) percent of the net sales of all devices manufactured and sold by Dazor which come within scope of this agreement; net sales are herein defined as the gross sales, less sales upon which devices have been returned for credit, as billed F. O. B. Dazor factory less delivery charges and cash discounts; and a licensed device shall be deemed to be sold when it has been billed.

"(4) The aforesaid royalties provided for herein shall become due and payable on the 15th day of September, December, March and June of each year, and each such payment shall be for all royalties accruing during the three calendar months preceding said dates.

"(5) Dazor agrees to keep accurate accounting records of the sale of lamps or other apparatus or devices embodying the inventions of Perbal, and to render to Perbal, at the time royalty payments are made as provided in paragraphs (3) and (4), a written itemized account setting forth the number of articles sold, the sale price, and all other information showing how the amount of the royalty payment was computed; and further, Dazor hereby grants Perbal the privilege of examining its books, at reasonable times, concerning the sale of devices affected by this agreement.

"(6) Upon failure of Dazor to make payment for royalties and to render the statement of the royalty account on the day when such payment and account are due, as herein provided, Perbal may terminate this license upon sixty (60) days written notice to Dazor, but if payment is made and the statement of account rendered within said sixty (60) days notice period, this license shall remain in full force and effect."

On October 20, 1942, Mr. Perbal was granted two patents, one for an electrical switch (No. 2,299,250) and the second for an improvement of the adjustable bracket (No. 2,299,251). On November 16, 1943, he was granted a fourth patent (No. 2,334,-436) on a joint for electrical fixtures (hereafter referred to as a "swivel joint").

In March 1941 Mr. Perbal had "some disagreement" with Mr. Dazey who then owned all the stock in the Dazor corporation, and "resigned his position as employee of the corporation," and moved to California. In 1946 at the invitation of Mr. Read (after he became the sole owner of Dazor) Mr. Perbal returned to St. Louis and thereafter spent at least some of his time at the Dazor office and place of business although he apparently continued to maintain a residence in California. However, in 1952 he had a disagreement with Mr. Read (a letter from him indicates that he thought his abilities were not being fully appreciated) and he wrote Mr. Read that "from now on I shall devote my time to other interests," and apparently he did not thereafter go to Dazor's place of business.

Dazor manufactured and used the improved adjustable bracket, the electrical switch, and the swivel joint with the consent of Mr. Perbal. In April 1947 a supplemental agreement was entered into between Dazor and Mr. Perbal and his wife, she having received half ownership of the patents. After reciting that the Perbals were the owners of the four patents above mentioned, and that Dazor was the "exclusive licensee" under the first patent

(No. 2,200,518), it was provided that "all terms and conditions" set forth in the agreement of August 31, 1940 were affirmed and ratified, and "The said agreement * * * is extended to include, cover and embrace" the said four patents, and that Dazor was "thereby granted an exclusive and universal license to manufacture and sell devices embodying the inventions of each of said Letters Patent." It was further provided that "this agreement shall continue to the full end of the term of the last-to-expire of said Letters Patent," unless sooner terminated. In December 1947, the Perbals and Dazor entered into an agreement reducing the rate of royalty payments. This will be discussed subsequently in our consideration of plaintiffs' appeal as to Count II. Reference hereafter to the "license agreement" refers to the terms of the agreement of 1940, as modified by the two amendments made in 1947.

In Count I plaintiffs alleged that from January 1, 1947 through October 20, 1959, (1) Dazor manufactured and sold lamps "not of the 'floating arm' as originally invented by plaintiff Perbal but which nevertheless embodied electrical switches substantially as described in Plaintiffs' Patent No. 2,299,250," and that (2) Dazor manufactured and sold "certain lamps and kindred apparatus not of the 'floating arm' type as originally invented by plaintiff Perbal but which nevertheless embodied joints for electrical fixtures substantially as described in plaintiff's Patent No. 2,334,436," but that Dazor did not include the "full sales price" of the lamps and apparatus in computing and paying royalties.

Dazor admits that during the time alleged in Count I, (a) on advice of counsel royalties were computed on "all lamps and other devices embodying the Perbal switch and no other Perbal invention on the basis of the sales value of the switch only, at 42 cents," and not on the basis of the "net sales," as defined in the license agreement, of the lamps or other devices in which the switch was embodied, and (b) after 1948

(when there was made what Dazor contends to have been a basic change in the swivel joint) royalties were not paid on the "net sales," as defined, of lamps and other devices which embodied a swivel joint only because, on advice of counsel, it did not consider the swivel joint it was then using to be covered by the Perbal patent. Royalties were paid on all devices sold during the period covered by Count I which embodied the adjustable bracket.

The trial court found that the swivel joint embodied by Dazor in lamps and other devices after 1948 was covered by the license agreement, and that during the time alleged in Count I, Dazor, by reason of its license agreement, was obligated to pay royalties based on a percentage of the "net sales," as defined on all lamps and other devices embodying either a switch or a swivel joint. An accounting was had, and judgment on Count I in favor of plaintiffs was entered in the amount of $174,618.21.

We have no issue presented to us pertaining to the application of the statute of limitations. Dazor's contention on this appeal is that as to the claims made in Count I it does not owe royalties, in addition to that paid, because (1) Dazor furnished plaintiffs a quarterly accounting with each royalty payment which constituted an "account stated or series of accounts stated" which were accepted by plaintiffs, and (2) in any event, the accounts were correctly stated and plaintiffs were paid for all royalties due them.

At each period designated in the license agreement Dazor submitted to Mr. Perbal a statement setting forth the dollar amount of sales during the reporting period "on which royalties are based," and the amount of "royalties earned." These statements did not set forth all the information called for by the licensing agreement, but according to Mr. Read, when he was an outside accountant and before he had any interest in Dazor, he discussed with Mr. Dazey and Mr. Perbal the use of what he called a simplified royalty statement, and according to Mr. Read both Mr. Dazey and Mr. Perbal agreed to the use of such a statement. The records kept by Dazor did reflect the items on which a royalty was being paid, and they also reflected that there were sales of items on which the royalty was not being paid. Mr. Perbal and his wife accepted the quarterly statements in the simplified form and the accompanying checks (which totaled $1,292,381.64) for payment of royalties without objection, and at no time did they ask that the statements contain more information or that they or their representative be permitted to examine the records of Dazor.

When the patents on the approved adjustable arm and the electrical switch expired on October 20, 1959, Dazor, after consultation with counsel, terminated payment of royalties. The first notice to Dazor that Mr. and Mrs. Perbal questioned the amount of royalty payments and the statements pertaining thereto, came by way of a letter from their attorney almost a year and a half after payments were terminated.

■ Generally stated, when the parties to an open account (an account, the balance of which has not been ascertained, 1 Am. Jur.2d, Accounts and Accounting § 4) reach an agreement with respect to the totality of the transaction between them, the new transaction results in what is called an account stated, which has been broadly defined as "an agreement based upon prior transactions between the parties, with respect to the correctness of the separate items composing the account, and the balance, if any, in favor of the one or the other." 1 Am.Jur.2d, Accounts and Accounting § 21. This court has defined an account stated as follows: " 'When parties having mutual matters of account between them growing out of a contract deliberately account together, and state a balance, and the party who, in such accounting, is found indebted to the other, pays the debt, or gives a written obligation for its payment, this settlement is so far conclusive between the

parties that it cannot be reopened or gone into, either at law or in equity, except on clear proof of fraud or mistake, or of an express understanding that certain matters were left open for future adjustment.' * * *." Caneer v. Kent, 342 Mo. 878, 119 S.W.2d 214. See also Gerstner v. Lithocraft Studios, Inc., Mo.App., 258 S.W.2d 250. The agreement creating the account stated is a new agreement, Matthewson v. Larson-Meyers Co., Mo.App., 217 S.W. 609, 613; Ward Manufacturing Co. v. Miley, 131 Cal.App.2d 603, 281 P.2d 343; Ralston v. Morgan, 50 Ariz. 504, 73 P.2d 94, and when the amount is paid the transaction may properly be referred to as an account settled. Dempsey v. McGinnis, 203 Mo.App. 494, 219 S.W. 148; Roadway Exp. Inc. v. Gordon, Okl., 277 P.2d 146. We shall continue in our discussion to refer to the transactions as an account stated although quarterly payments were made by Dazor and accepted by plaintiffs.

■ The rendition of the account is usually made by the creditor to the debtor, but an account stated may be established by the rendition of an account by the debtor, Corbin on Contracts, § 1315, p. 287; Gordon Campbell Petroleum Co. v. Gordon Campbell Kevin Syndicate, 75 Mont. 261, 242 P. 540; 1 Am.Jur.2d, Accounts and Accounting § 24, and an account stated may be predicated upon the rendition of a statement of a balance without setting forth the constituent items. Wiggins v. Weston, Mo., 339 S.W.2d 781; Conkling v. Henry Quellmalz Lumber & Mfg. Co., Mo.App., 20 S.W.2d 564. Also, all the items of an account may be on one side only, and the statement of the account need not be in any particular form. Wiggins v. Weston, supra.

■ One essential element of an account stated is that there must be an agreement, either express or implied, between the parties that the amount set forth in the statement of account is correct, and the transaction, whether consisting of the actual payment of the money or an agreement to pay, must be understood by the parties as a final adjustment or statement and not a payment or an agreement to pay the stated amount on the account. Bloss v. Aurora Milling Co., 207 Mo.App. 402, 229 S.W. 833; Quint v. Loth-Hoffman Clothing Co., 207 Mo.App. 391, 233 S.W. 92; F. G. Barton Cotton Co. v. Vardell, 217 Mo.App. 691, 275 S.W. 62; 1 C.J.S. Account Stated § 28a; Corbin on Contracts, § 1315, p. 287. There can be no question but that each quarterly statement of account, with accompanying check, was intended by Dazor to be a correct and final statement of what was then due plaintiffs. Sales of items not included in the total sales upon which royalties were computed were intentionally left out by Dazor, on advice of counsel, on the basis that royalties were not payable based on those sales. They were not omitted by reason of mistake in compiling the figures. The agreement or understanding on the part of the creditor to accept such statements and payments as correct and final may be but seldom is established by direct evidence. It may be established, however, just as effectively by proof of circumstances, Cammann v. Edwards, 340 Mo. 1, 100 S.W.2d 846, from which such an agreement is implied. 1 Am.Jur.2d, Accounts and Accounting § 28. One of the most common circumstances establishing such agreement is the receipt and retention of the statement of account, and the receipt of the money in payment of the account, without protest or objection for more than a reasonable time. Gerstner v. Lithocraft Studios, Mo.App., 258 S.W.2d 250; Kansas City Commercial Photo View Co. v. Kansas City Bridge Co., 208 Mo.App. 255, 233 S.W. 947; Bloss v. Aurora Milling Co., supra; Bailey v. Robinson Mfg. Co., Sup., 60 N.Y.S.2d 225; 1 Am.Jur.2d, Accounts and Accounting § 30; 1 C.J.S. Account Stated § 37; Corbin on Contracts § 1313. What amounts to a reasonable time necessarily varies with the circumstances of each case. Bearing on that issue is the fact that the person to whom the account was submitted either knew or had readily available the means of knowing the relevant facts, and also the fact that the stated account was

paid and the money retained without question or protest.

■ The provision in the license agreement that Mr. Perbal should have the right to examine the books of Dazor "concerning the sale of devices affected by this agreement" was included for a purpose. In fact, it placed a duty on Mr. Perbal to examine those books, or by not doing so to be placed in the position of admitting inferentially that the payments made to him were correct. Although not pertaining to an account stated, we consider appropriate the statement by Judge Lamm in State ex rel. Bell v. Yates, 231 Mo. 276, 132 S.W. 672, 676, that "he who has at his disposal the means of knowing is held to know; that he who shuts his eye[s] when to open them and look is to see is held to see; and that, where there is a duty to use diligence, those facts which diligence will discover are presumed to be known under the law of notice." In this case, over a total period of nineteen years, and for more than twelve years during the period included in the claim under Count I, the plaintiffs accepted the quarterly statements of account and the payments accompanying those statements. During that time they had the contractually granted right to examine Dazor's books of account where the full information was available, but did not do so. At various times during this period Mr. Perbal was in Dazor's office. From February 1946 and for about six years he had a desk assigned to him, and on occasions he performed work there.

It is argued in plaintiffs' brief that Mr. Perbal was not an accountant. However, at one time Mr. Perbal had his tax attorney examine Dazor's books, and there was no reason why he could not, at any time, have exercised the right granted to him by the license agreement to have Dazor's books examined by his representative. Plaintiffs also argue that a confidential relationship existed between them and Mr. Read. There was no confidential relationship with Mr. Read when the license agreement of August 31, 1940 was negotiated. Mr. Read was then an independent accountant and had no ownership in Dazor. Plaintiffs assert that such relationship resulted because they "relied on Read to handle receipts of their property and their income tax returns." Apparently Mr. Perbal did obtain some free tax advice from Mr. Read, whose background was that of an accountant, but we do not find what is referred to by "receipts of their property." Before Mr. Read obtained any interest in Dazor, Mr. Perbal resigned his position as an officer and employee of Dazor because of some "disagreement" with Mr. Dazey and went to California. Mr. Perbal served as consultant to Dazor from February 1946 to June 1952, but severed that relation because of a disagreement. We find no confidential relationship which would affect the imposition of an account stated in this case.

■ The principle of assent by silence and acceptance of a statement of account without objection or question within a reasonable time would mean practically nothing if it does not apply to the factual situation of this case. We conclude that an account stated, or by reason of the payment and acceptance of the money what may be called an account settled, was established in this case.

■ This presents the issue of whether, and if so under what circumstances, the plaintiffs can impeach the account settled when it is pleaded and established by evidence as a defense to plaintiffs' action on the original contract. As stated in Caneer v. Kent, supra, when an account stated is arrived at and the debtor pays the debt, the settlement is conclusive between the parties and cannot be reopened or gone into "except on clear proof of fraud or mistake." This is the usual statement of the general rule. Ellis v. Farmer, Mo., 287 S.W.2d 840; Berkstresser v. Finnell, Mo.App., 181 S.W.2d 37; Dempsey v. McGinnis, 203 Mo.App. 494, 219 S.W. 148; 1 Am.Jur.2d, Accounts and Accounting §§ 34 and 35, 1 C.J.S. Accounts Stated § 48;

Corbin on Contracts, § 1315. There is no contention or evidence of fraud in this case. The only question is whether the intentional omission of sales of certain devices by reason of the opinion on the part of Dazor that they were not covered by the license agreement constitutes a mistake within the meaning of that term as used in relation to reopening an account settled.

We have found no case pertaining to an account stated which expressly defines what constitutes a "mistake." Most of the cases involve the situation where the creditor submits a statement and the debtor expressly or by inference agrees that it is correct but does not pay and the debtor sues on the account stated. In a case somewhat comparable to this case on its facts, Rehbock v. Reservoir Hill Gasoline Co., 14 Cal. App.2d 233, 57 P.2d 1357, the plaintiffs sought to recover royalties due for gasoline extracted from "wet" gas. Over a period of years plaintiffs had received monthly statements and payments without objection. Defendant's defenses included that of account stated. It was held that plaintiffs "knew or should have known" the facts, and that the monthly statements accompanied by checks in payment of the lessor's royalty, accepted and retained without objection, constituted accounts stated conclusive between the parties. In that case, as here, plaintiffs' action was on the original contract, and the court said: "The action is not based upon fraud or mistake. The only charge made was of a failure to fully and correctly account for and pay the royalties due." In Williston on Contracts, § 1864, it is commented that "So far has this last defense [of mistake] sometimes been carried that the nature of an account stated is frequently lost sight of, and it is sometimes regarded as if it were an admission, making out a prima facie case, rather than a contract to pay the stated sum, which must be set aside in order to recur to the original claims which form the basis of the stated account." In his treatise on contracts Corbin comments on the theory that any mistake can be shown to impeach an account

stated, and says that "if an account stated is not conclusive in case it is shown to be mistaken, it would appear to be conclusive when it is correct and not conclusive when it is incorrect, conclusive when it is identical with the antecedent items upon which it is based, and not conclusive when it is not identical." Corbin on Contracts, § 1315.

We recognize that there are numerous cases which use the language that an account stated may be impeached for "mistake," for example, Caneer v. Kent, supra, but that statement standing alone is inconsistent with the principle of an account stated. We are of the opinion that, as in this case, when the debtor submits to the creditor an accounting, and pays that account, and the creditor accepts the accounting and retains the payment, without objection or protest for an unreasonable period, and he knows or is in a position where he should be held to know the facts, an account stated results which is conclusive between the parties. This new contract giving rise to the account stated precludes an action by the debtor on the original contract for the items covered by the account settled until that new contract is set aside on some recognized ground. Plaintiffs' claim on Count I is based on the original contract, and they have not established circumstances justifying this court to set aside the account stated.

By reason of the above conclusion pertaining to Dazor's contention of an account stated we need not consider its contention that as to Count I all royalties required by the license agreement were paid. We reverse the judgment as to Count I.

By Count III plaintiffs claim royalties based on the sale of lamps and other devices embodying one or more of the patented inventions from October 21, 1959 to November 16, 1960. By Count IV they make the same claim for the period November 17, 1960 to August 21, 1962, when plaintiffs terminated the license agreement.

The patent on the original adjustable bracket expired on May 1, 1957, but this

bracket was not used by Dazor after 1942. The patents on the improved adjustable bracket and the electrical switch each expired on October 20, 1959. The patent on the swivel joint expired on November 16, 1960.

As to Count III the trial court held that the "language of the 1947 license agreement" extended the term of the agreement at least to November 16, 1960 (the date of the "last-to-expire" of the patents expressly mentioned in the license agreement), and it entered judgment on Count III for $151,-950.45. This included royalties based on the sale of lamps and devices embodying the swivel joint. It also included royalties based on the sale of lamps and devices embodying either the adjustable arm or the electrical switch, or both, but not the swivel joint, even though the patents on these two inventions had expired prior to the period covered by Count III.

In 1954 Mr. Perbal obtained a patent (No. 2,665,102) on a second improvement to the adjustable bracket which was never used by Dazor. As to Count IV, the trial court held that this patent extended the term of the license agreement to the time of its expiration or until the agreement was terminated, which plaintiffs did on August 21, 1962. It further held that "Dazor was obligated to pay royalties on all devices using any Perbal inventions until August 21, 1962" and that its failure to do so "violated the license agreements." It entered judgment on Count IV in the amount of $232,-580.27, which was for royalties on inventions embodied by Dazor in its products on which the patent as to each had expired.

While plaintiffs contend that the swivel joint manufactured and embodied by Dazor into its products was within the coverage of Patent No. 2,334,436, which expired on November 16, 1960, we do not understand this to be essential to their claim. Their claim, as we understand it, is that the license agreement gave Dazor "exclusive rights to all of Perbal's inventive work in Dazor's field of business," and for that

reason plaintiffs were entitled to be compensated by way of the royalty payments provided for in the license agreement "for every use of the inventive work prior to the termination of the contract."

Dazor did not pay royalties during the periods covered by Counts III and IV, and its theory in not doing so was that the patents on the improved adjustable bracket and the electrical switch had expired, and based on advice from counsel it was of the opinion that the swivel joint it was using was not covered by the Perbal patent, and that in any event that patent expired on November 11, 1960. Dazor also contends that the license agreement requires "post-expiration royalties" and "mandatory package" licensing, which is a "misuse of patent rights," and for that reason plaintiffs are not entitled to recover anything under Count III or Count IV. We will consider first the question of "post-expiration royalties."

▮ A United States patent grants to the patentee a monopoly over his invention for a period of seventeen years. 35 U.S.C.A. § 154. The nature and extent of a patent, and the legal consequences of the expiration of a patent, are governed by the patent laws of the United States and are federal questions. Therefore, we are governed by the construction of those laws by the federal courts.

▮ Congress has granted to the inventor the opportunity to secure the material rewards for a limited time on condition that he make full disclosure for the benefit of the public of the manner of making and using the invention, and upon the expiration of the patent the public is left free to use the invention. In Scott Paper Company v. Marcalus Manufacturing Co., Inc., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, the United States Supreme Court stated: "The aim of the patent laws is not only that members of the public shall be free to manufacture the product or employ the process disclosed by the expired patent,

but also that the consuming public at large receive the benefits of the unrestricted exploitation, by others, of its disclosures. * * * Hence any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, *whatever the legal device employed,* runs counter to the policy and purpose of the patent laws." See also Prestole Corporation v. Tinnerman Products, Inc., 6th Cir., 271 F.2d 146, certiorari denied, 361 U.S. 964, 80 S.Ct. 593, 4 L.Ed.2d 545; and Scapa Dryers, Inc. v. Abney Mills, 5th Cir., 269 F.2d 6, certiorari denied, 361 U.S. 901, 80 S.Ct. 209, 4 L.Ed. 156. That the prohibition of continuing the patent monopoly after the patent expires extends to royalty payments is made clear in Brulotte v. Thys Co., 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99, 3 A.L.R.3d 761, by this statement of the court: "A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly. But to use that leverage to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent by tieing the sale or use of the patented article to the purchase or use of unpatented ones." It was said in the same case, "But patents are in the federal domain; and 'whatever the legal device employed' * * * a projection of the patent monopoly after the patent expires is not enforceable," and "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se.*" See also Ar-Tik Systems, Inc. v. Dairy Queen, Inc., 3d Cir., 302 F.2d 496.

 In our opinion a proper construction of the license agreement does not call for the payment of royalties for the use of a patented invention after the expiration of the patent. Where an agreement is susceptible of two constructions, one of which renders the contract invalid and the other sustains its validity, the latter construction is preferred. Scapa Dryers, Inc. v. Abney Mills, 269 F.2d 6. In addition, there is a presumption that royalties are not to be paid after the expiration of a patent. E. R. Squibb & Sons v. Chemical Foundation, 2d Cir., 93 F.2d 475. By the 1940 agreement Dazor was granted the license to manufacture and sell lamps and other devices which embodied the invention "described and claimed" in Patent No. 2,200,518, the original adjustable bracket, "for the full life of said patent." In turn Dazor agreed to pay a royalty based on the net sales "of all devices manufactured and sold by Dazor which come within the scope of this agreement." Under no reasonable interpretation could it be said that the original agreement purported to impose a duty to pay a royalty after the patent expired. The supplemental agreement listed three additional patents, the improved adjustable bracket, the electrical switch and the swivel joint, which the agreement should "include, cover and embrace." A proper construction of the agreement, as supplemented, was that for the use by Dazor of any of the patents, a royalty should be paid, and that royalty was to be the same whether one, two or three of the patented inventions were used. It is true that the supplemental agreement provided that the agreement thus reached should continue to the full end of the term of the last-to-expire of the four patents listed, but the term of the agreement is not necessarily the period during which an obligation to pay royalties as to each patent was imposed. The obligation of Dazor to pay a royalty based on the sale price of a device incorporating either an improved adjustable bracket or electrical switch, but not a swivel joint, terminated by the terms of the agreement on October 20, 1959, the date the patents on those two inventions expired. Subsequently on November 16, 1962 the patent on the swivel joint expired, and at that time the obligation of Dazor to pay a royalty for the use of the swivel joint terminated.

The judgment of the trial court on Counts III and IV awarded royalties for the use by Dazor of one or more of the

patented inventions after the patent had expired. This was based on a construction of the license agreement that it required the payment of royalties for every use by Dazor of the inventive work of Mr. Perbal prior to the termination of the contract. If we should adopt that construction we would be compelled to find a misuse of the patents within the meaning of the Brulotte and Scott cases. See Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363. We prefer our construction of the license agreement, and the result of it is that the inclusion in the judgment on Count III of royalties for the use of the adjustable bracket and electrical switch was erroneous, and the award of any royalties under Count IV was erroneous.

We shall now consider the issue of "mandatory packaging licensing." In view of our previous ruling this contention is important only as to the liability of Dazor under Count III for royalties for the use of the swivel joint before the patent on that invention expired. Generally stated, Dazor's contention is that the license agreement covered more than one patent and provided for a flat percentage of the sales price of the device in which they were embodied without providing for a reduction in the amount of the royalty at the expiration of the adjustable bracket, which Dazor contends and plaintiffs seem to admit was the most important of the patented inventions. The argument is that by the continuation of the same rate of royalty for use of the swivel joint after the expiration of the patent on the most important invention, plaintiffs were in effect exacting a royalty for the use of the invention after the patent expired.

■■■ The accumulation of a number of patents by one person and including them in one licensing agreement is not of itself illegal. Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312. See also International Mfg. Co. v. Landon, Inc.,

9th Cir., 336 F.2d 723, certiorari denied, Jacuzzi Bros., Inc. v. Landon, Inc., 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610, pertaining to mandatory packaging agreements for interlocking patents related to the production of one product. However, as held in Rocform Corp. v. Acitelli-Standard Concrete Wall, Inc., 6th Cir., 367 F.2d 678, a mandatory packaging license agreement does constitute a misuse of patent, and therefore is illegal, when the agreement calls for the continuation of a flat rate royalty after the expiration of the patent constituting the most important consideration for the license. See also American Securit Co. v. Shatterproof Glass Corp., 3d Cir., 268 F.2d 769.

■■■ We consider this alleged defense to Count III by Dazor not to be applicable to this case. It is true that the license agreement called for the same rate of royalty after the expiration of the patent on the improved adjustable bracket, but the Perbal patents were not interlocking in the sense that the lamps and devices manufactured and sold by Dazor required all three patented inventions to be used. We see no reason why, under the facts of this case where a lamp or other device might embody only the swivel joint, it would not be proper for the parties to agree that a proper royalty for the use of the swivel joint alone should be the same for the use of the adjustable bracket alone, or for the use of the two together. Also, as stated in Rocform Corp. v. Acitelli-Standard Concrete Wall, Inc., supra, when a licensee seeks relief from a mandatory packaging license agreement which he has signed voluntarily, he should show a demand by him and a refusal by the patent holder for the desired patent or patents as a separate item or items. This Dazor did not do. Such a demand is not necessary to a defense on the basis of misuse of patent when the patent holder seeks equitable relief from infringement while still pursuing the illegal practice, but here Dazor seeks relief from a legal claim.

Plaintiffs make a contention in connection with Counts III and IV which, if meritorious, would seem to permit the judgments thereon to stand notwithstanding the rule pertaining to misuse of patent by "post-expiration royalties." They contend that the "subject matter of the [license agreement] was all of Perbal's inventions and improvements that he might make in the future," and that as to "every utilization by Dazor of either an invention or an improvement he was entitled under the 1940 agreement to the stipulated royalty." Plaintiffs also contend that a "continuing course of development was contemplated and followed out," and that this "development relationship" requires a liberal construction of the contract to give Perbal the benefit of Dazor's utilization of his work. This argument appears to indicate a theory of quantum meruit, but it is presented in support of the claim that the license agreement called for something more than royalties for the use by Dazor of patented inventions during the life of the patents, and that the parties agreed that plaintiffs were to be paid a percentage of the sales of devices "embodying an improvement." The only improvements made by Mr. Perbal on any invention covered by the license agreement, for which he obtained a patent, were the two improvements on the adjustable bracket. Dazor paid royalties for its use of the first improvement and it never used the second. Plaintiffs seem to contend that the license agreement provided that Dazor and Mr. Perbal were to work together to develop and improve his inventions, and that the royalty rate provided for in the license agreement was to compensate him for his efforts, which should be considered "improvements" even though they may not have shown "an inventive advance." They contend that this contractual obligation to pay compensation for "improvements" was to continue beyond the expiration of any and all patents covered by the license agreement. The cases cited and relied on by plaintiffs are to the effect that a purchaser of a machine secured by a patent which is subject to improvements is entitled to the improvements, Aspinwall Mfg. Co. v. Gill, D.C.Cir., 32 F. 697; an invention even though not patented is property, Ulman v. Thompson, 57 Ind. App. 126, 106 N.E. 611; a person can contract for an unpatented idea, Acme Chair & Metal Crafts Co. v. Northern Corrugating Co., 209 Wis. 8, 244 N.W. 582; Ingraham v. Schaum, 157 Pa. 88, 27 A. 404; and one who gives another in confidence a patentable invention is entitled to the benefits of that patent when obtained by the other. Saco-Lowell Shops v. Reynolds, 4th Cir., 141 F.2d 587; Baker Oil Tools, Inc. v. Burch, 10th Cir., 71 F.2d 31; Sloan v. Mud Products, Inc., 114 F.Supp. 916; Servo Corp. of America v. General Electric Company, 4th Cir., 337 F.2d 716. We cannot agree with this theory of plaintiffs or that these cases support it.

The license agreement of 1940 definitely contemplates that the term "improvements" as used in paragraph 2 apply to patented improvements. Paragraph 2 provides that Dazor should have the right to manufacture and sell lamps and devices "embodying any improvements *on the invention aforesaid.*" That referred to improvements on the adjustable bracket, and by the supplemental agreement in 1947 the reference was extended to improvements on the improved adjustable bracket, the electric switch, and the swivel joint. The agreement clearly limited the above reference to improvements to patented improvements because the immediately following phrase is that "and this License Agreement shall extend to and include any patent or patents which may hereafter issue to him on such improvements." Finally, if there be any doubt about the above construction, in December 1947, the parties amended the license agreement pertaining to the payment of royalties, and by the amendment provided that Dazor should pay to plaintiffs a royalty at the rate therein specified on "sales of all devices covered by Licensee's patents."

It may be that in 1938 when Mr. Perbal and Mr. Dazey formed a corporation there

was some plan for Mr. Perbal to work with the corporation to develop his inventions. However, whatever that plan was, it was terminated by Mr. Perbal when he severed that relationship in 1941 because of some disagreement. Thereafter Mr. Dazey operated Dazor alone, and later in partnership with Mr. Read. Subsequently Mr. Read became the sole owner of Dazor. In 1946 Mr. Perbal returned to some sort of an advisory association with Dazor which continued until June 1952 when he terminated it because of a disagreement. It is true that while in California Mr. Perbal submitted some designs or plans for certain changes in Dazor's lamps, which perhaps he thought were improvements, but Dazor was not required to adopt them or use them in any way and did not do so. It is also true that Mr. Perbal obtained a patent on a second improvement to the adjustable bracket, but Dazor at no time embodied that invention in any lamp or device and it was not required to do so.

We are unwilling to construe the language of the license agreement contrary to what we consider to be its clear meaning and import. We consider it to be clearly expressed, and borne out by the circumstances, that Mr. Perbal's compensation for "Dazor's utilization of his work" was to be the royalties payable for the use of the inventions described by patent number in the license agreement, and the royalties payable on any other patented invention constituting an improvement on his patented inventions and used by Dazor. In addition, we consider the proposal of plaintiffs which we have here discussed to be prohibited by the principle announced in Scott Paper Co. v. Marcalus Co., supra, that royalties for the use of a patent beyond its expiration are contrary to public policy "whatever the legal device employed."

The above conclusions require a determination whether that part of the judgment pertaining to Count III for royalties for the use by Dazor of the swivel joint after the other patents had expired and up to November 16, 1960, when the patent on the swivel joint expired, was proper. This was argued by the parties in a point applying primarily to Count I. However, Dazor's point is not limited to Count I, but is that the swivel joint used by it "during all the periods involved under Counts I, III and IV was not plaintiffs' patented swivel joint, and was not within the claims, coverage and scope of plaintiffs' patent."

The swivel joint was patented November 16, 1943. It was what is known as a combination patent in that it was a combination of various elements to produce a new and novel result; that of movability without abrasion or wear on the electrical wires with maintenance at any fixed position. The swivel joint described in the patent consisted of various parts assembled to accomplish the stated purposes with "resilient clips interconnecting adjacent external marginal portions of said sections for holding the recited parts in assembly." Soon after Dazor started using the swivel joint in which the "resilient clips" constituted the means of holding the external parts in assembly, complaints developed because the clips became loose and did not hold the head of the lamp properly. In order to remedy this condition Dazor drilled a hole through the two side members and secured them together by use of a screw. The clips then performed no function in holding the sides together, but until the latter part of 1948 Dazor continued to use a swivel joint containing both the clips and the screw. At the end of 1948 Dazor's engineer redesigned the side portions of the swivel joint to eliminate the clips and to use a screw threaded into a binding post added to one of the side members. Apparently Dazor continued to consider the swivel joint it was using to be covered by the Perbal patent, at least while both the clips and the screw were being used. However, in 1950 a competitor's lamp, which embodied a swivel joint held together by a screw but not using clips, came to the attention of Dazor. After conferring with its patent counsel Dazor came to the conclusion that the swivel joint it was then using was not

covered by the Perbal patent, but it did not advise Mr. Perbal that it had come to that conclusion.

▬▬▬ The liability of Dazor for royalties for the use of the swivel joint after October 20, 1959, and to the expiration of the patent on November 16, 1960, the period covered by Count III, is to be determined by the terms of the license agreement. 69 C.J.S. Patents § 258. Our construction of that agreement, as above set out, is that royalties were to be paid if the swivel joint manufactured and used by Dazor in its products was included within the description and claims of the Perbal patent on the swivel joint. The test of whether the swivel joint used by Dazor is "within the coverage of the patent, for purposes of a suit for royalties, is the same as that employed in a patent infringement suit." American Photocopy Equipment Co. v. Ampto, Inc., 82 N.J.Super 531, 198 A.2d 469; Cold Metal Process Co. v. United Engineering and Foundry Co., 3d Cir., 235 F.2d 224. A patent license is permission to do a thing which the licensor could prevent. Western Electric v. Pacent Reproducer Corp., 2d Cir., 42 F.2d 116, certiorari denied, 282 U.S. 873, 51 S.Ct. 78, 75 L.Ed. 771. In other words, if Dazor could have manufactured and sold devices embodying the swivel joint which used a screw and not clips without a license from the patentor, Dazor would not be liable for royalties for its use.

▬▬▬ The monopoly granted to an inventor is defined by the claims of his patent, Metal Cutting Tool Service v. National Tool Co., 6th Cir., 103 F.2d 581, and claims for a combination of elements, all of which are old in the same field, should be narrowly construed. American Doucil Co. v. Twin City Water Softener Co., 8th Cir., 36 F.2d 673, certiorari denied, 281 U.S. 756, 50 S.Ct. 410, 74 L.Ed. 1166. In this case, Mr. Perbal's first claim for his combination patent on the swivel joint, after describing other features of the invention, provided for "resilient clips inter-

connecting adjacent external marginal portions of said sections for holding the recited parts in assembly." In the second claim, reference was made to "externally mounted, U-Shaped resilient clips embracing adjacent marginal portions of said sections, said clips holding the body sections in pressure engagement with the first said bracket arm at one end of said body and with said annular member at the opposite end of the body, whereby frictionally to restrain relative rotation of these members of the body." Mr. Perbal, the inventor, described his claims for his invention, and to secure the result of movability without wear on electrical conduits and maintenance of a position once fixed, he voluntarily declared as a material or essential element of his combination the use of "resilient clips." It is true that the clips as such were not patentable, but no other individual item of the combination when considered alone was patentable.

▬▬▬ Whether Dazor's change in the swivel joint took it out from under the patent is a close question, and involved in the question is the application of the doctrine of equivalents. As noted by Judge Learned Hand in Claude Neon Lights, Inc., v. E. Machlett & Son, 2d Cir., 36 F.2d 574, 576, there is an apparent conflict between the doctrine of equivalents and the doctrine that a patent is limited by the claims of the patentor. Claims of a patent must also be construed in the light of the prior art, 69 C.J.S. Patents § 204d, and in a crowded art, into which the patent on the swivel joint falls, the range of equivalents is narrow. Faries Mfg. Co. v. S. W. Farber Mfg. Co., 2d Cir., 47 F.2d 571. Each party called an expert witness as to this issue, and the two of them reached opposite conclusions. Plaintiffs' witness relied primarily on the doctrine of equivalents, and Dazor's witness relied primarily on the construction of the claims of the inventor. We have set out the above discussion of this issue to demonstrate that Dazor was not acting totally without justification in failing to pay royalties for use of the

swivel joint, and we are inclined to the view that the swivel joint without the clips was outside the coverage of the patent. However, to so hold would not resolve the issue of liability. During the period covered by Count III Dazor advertised its products embodying the swivel joint, which admittedly was an element of its "Floating Fixtures," as follows: "Dazor Floating Fixtures are manufactured under one or more of the following patents: 2,200,518, 2,299,250, 2,299,251 and 2,334,436; other patents pending." The first three patents expired on or before October 10, 1959. The only patent listed which was in existence during the term covered by Count III was No. 2,334,416, which covered the swivel joint. In addition, Dazor marked its devices containing the swivel joint as "patented and patents pending." During the period covered by Count III the only existing patent pertaining to inventions embodied in the devices so marked was that on the swivel joint.

■■■ It has repeatedly been held that when one who has a license to manufacture and sell a patented product advertises that its product was manufactured and sold pursuant to that patent, he cannot subsequently contend that it had made some change in the product which removed it from the coverage of the patent, and thereby avoid the payment of royalties provided for in the license agreement. Cold Metal Process Co. v. McLouth Steel Corporation, 6th Cir., 170 F.2d 369, 379; Wilcolator Co. v. Robert Shaw Thermostat Co., 26 F.Supp. 255; Andrews v. Landers, 72 F. 666; Kant-Skore Piston Co. v. Sinclair Mfg. Corp., 6th Cir., 32 F.2d 882, certiorari denied, 281 U.S. 735, 50 S.Ct. 249, 74 L.Ed. 1150; Touchett v. E. Z. Painter Corp., 150 F. Supp. 384; Sproull v. Pratt & Whitney Co., 97 F. 807. Johann v. Milwaukee Electric Tool Corp., 264 Wis. 447, 59 N.W.2d 637, certiorari denied, 347 U.S. 913, 74 S.Ct. 477, 98 L.Ed. 1069. In some of these cases the advertising consisted only of attaching the patent number to the item manufactured, but we deem it immaterial how the ad-

vertising was done. We expressly limit the application of this rule to a suit by the licensor on a contract for royalties accruing during the life of the patent where the licensee has changed the patented device but continued to mark the device as being manufactured and sold under the patent. An intent to deceive the public is not involved. Also, the rule does not create a cause of action for royalties after the expiration of a patent.

A part of the judgment entered as to each of Counts I, III and IV consisted of royalties based on what is referred to as "Canadian sales." Certain additional facts are necessary.

Prior to 1944 Dazor sold lamps in Canada and included the sales prices in its total sales for the purpose of computing royalties, although the Perbal patents had no effect in Canada. In November of that year Dazor entered into an agreement with Amalgamated Electric Corp. Ltd. of Toronto, Canada, whereby Dazor assigned its Canadian trademark rights in the name of "Dazor," agreed to furnish Amalgamated with necessary information to facilitate the manufacture of lamps in Canada, and granted Amalgamated exclusive rights in any Canadian patents owned by Dazor and also the exclusive right to manufacture, assemble and sell Dazor's products in Canada. Pursuant to this arrangement Dazor manufactured and sold to Amalgamated various parts of lamps, including the parts for assembly in Canada of some or all of the Perbal inventions, and perhaps the assembled Perbal inventions. Amalgamated then obtained other necessary parts from other sources, assembled them into lamps and sold them in Canada. Dazor sold the parts to Amalgamated at cost plus 25%, and also received "an engineering service charge" of five percent of the net selling price of the lamps. Royalties were not paid to plaintiffs on these sales by Dazor to Amalgamated.

■■■ As to Counts I and IV we have held that the judgments were improper,

and that would include the portions thereof pertaining to Canadian sales. As to Count III we have held that the judgment can be based only on sales of lamps and devices embodying the swivel joint. Although the record does not contain a breakdown of the Canadian sales during the period covered by Count III, we assume the swivel joint and its parts were sold by Dazor to Amalgamated. However, assuming the swivel joint sold to Amalgamated was covered by the Perbal patent, the sale did not result in a contractual duty to pay the royalties prescribed in the license agreement. Instead it constituted an infringement of the patent.

 By the license agreement Dazor was not granted a license to manufacture and sell the parts of the swivel joint or the assembled swivel joint to Amalgamated or anyone else. The license was "to manufacture and sell lamps and other devices embodying the invention." That this was not intended to include the right to sell the swivel joint separately is evidenced by the fact that there is no provision for royalties to be computed on such sales. Royalties are computed on "the net sales of all devices manufactured and sold by Dazor * * * as billed F. O. B. Dazor factory." The term "devices" as here used refers to the previous phrase "lamps and other devices embodying the invention." An owner of a patent may by license limit the use or disposition of the patented invention by the licensee. Westinghouse Electric & Mfg. Co. v. Tri-City Radio Electric Supply Co., 8th Cir., 23 F.2d 628. When a licensee exceeds the rights granted by the license he becomes an infringer of the patent, 69 C.J. S. Patents § 288, which is a "tort or wrong." Heath v. A. B. Dick Company, 7th Cir., 253 F.2d 30. It may be that the royalty provided for in the license agreement could be considered a fair measurement of damages for the tort of infringement, but those damages for tort cannot properly be recovered in an action in contract on the license agreement.

Dazor also challenges the method of computation of royalties under Counts III and IV, and asserts that plaintiffs failed to make proof by competent evidence that any amount was owing to them. By reason of our rulings, this contention is now limited to royalties due under Count III for the use of the swivel joint. Plaintiffs are aware of the contentions of Dazor concerning the need of adequate proof of the amount due, and in the recomputation of royalties according to the views here set forth they may proceed with their proof advisedly.

For the reasons herein set forth the judgments on Counts III and IV are reversed, and the cause as to Count III is remanded with directions that the royalties for use by Dazor of the swivel joint be recomputed according to the proof thereof and in compliance with the views here expressed.

We turn now to plaintiffs' appeal from the judgment of the trial court in favor of Dazor as to Count II of their petition.

After some negotiations between Mr. Read and plaintiffs and some expressions by Mr. Read of adverse economic and business conditions, a letter addressed to Mr. Read as president of Dazor and prepared by Mr. Lawrence H. Cohn (who was patent counsel for Dazor and also for Mr. Perbal) was executed by Mr. and Mrs. Perbal, on December 15, 1947, said letter being as follows:

"Pursuant to our recent discussions of the subject, you may accept this letter as our assent to a modification of the royalty rate specified in our license agreement of August 31, 1940.

"In agreeing to a reduction we are particularly mindful of the cordial relationship that has existed between ourselves and the Corporation since you became its president and general manager, and we are confident that our interests will continue to be regarded with fairness and understanding as long as you are in control.

"I count as one of these interests the prestige that the Dazor Floating bracket enjoys in the industry. It is my firm conviction that in order to maintain this valuable reputation, the Corporation must exercise the greatest possible care in the design and engineering of new products that bear the Dazor name. It is in this respect that I feel that I can be of substantial service to the Corporation and would welcome the opportunity to consider, from an engineering standpoint, and to advise on new products and design changes in the old ones, before the same have been put into practice. If given this opportunity I feel that I would be adequately compensated for the reduction in the royalty rate, hereby agreed upon.

"Accordingly, our understanding of the new basis for computing and paying royalties is set forth below in two paragraphs which are to be substituted respectively for paragraphs 3 and 4 of the agreement of August 31, 1940. It is understood that these changes, where applicable, shall be effective as of January 1, 1947, and shall continue in effect so long as you personally control the affairs of the Corporation, whereafter the former five percent royalty rate shall be restored." * * * [The two substituted paragraphs were then set out.]

Between 1948 and 1951 Mr. Perbal worked at his home in California to improve Dazor's products. He made new models of lamps and developed what he considered to be a more "graceful" floating arm for lamps. He also developed a floating arm using a new mechanical principle which he patented. This was Patent No. 2,665,102, previously referred to as the second improvement on the adjustable bracket. His development work also included working samples of an improved electric switch and starter for fluorescent lamps, but no patents were obtained. Dazor did not put into production any of Mr. Perbal's improvements or new models, and it did not follow any of his engineering suggestions. On January 11, 1954, after Mr. Perbal had a disagreement with Mr. Read and notified him that he would thereafter "devote [his] time to other interests," Mr. Perbal wrote Mr. Read that he had "decided not to sell" his patents to Dazor at that time, and after commenting on Dazor's progress, he said this:

"In the meantime I wish to remind you that when you bought Dazor you asked every one to make a sacrifice, for this reason I have reduced my royalties from 5 to 4½ and 4%. I told you at the time that I would expect you to return to the 5% rate or higher when your financial status had improved, I did not press this before, not wanting to interfere at all with the wonderful improvements you have made in the office and factory, also the creation of your pension plan, but knowing that you are at present in good financial position, I am asking you to return to the 5% rate beginning January 1, 1954."

On January 28, 1954, Mr. Read replied to the above request, and stated that Dazor "would not be interested in modifying the contract along the lines of your suggestion." He further stated that "the contract provides for the restoration of the former five per cent royalty rate after I shall cease to control personally the affairs of the Dazor Manufacturing Corp. That event has not occurred: Moreover nothing immediate in that direction is contemplated." In 1955 in an exchange of letters between Dazor and Mr. Perbal, reference was made to the license agreement of August 31, 1940 "as affirmed * * * December 15, 1947."

Plaintiffs alleged in Count II that Mr. Read induced them "as a personal accommodation to him" to execute the letter of December 15, 1947, and that their consent to the royalty reduction was without consideration. The trial court held that plaintiffs consented to the reduction in the royalty rate; that the reduction was contingent upon and was to continue only so long as Mr. Read remained personally in control of the affairs of Dazor; and that

the fact that Mr. Read continued in personal control of Dazor throughout the period covered by Count II "constitutes consideration for the plaintiffs' consent to reduction in the royalty rate."

On their appeal plaintiffs contend that the trial court erred in its judgment for Dazor on Count II because (1) plaintiffs' consent to a reduction in the royalty rate was unilateral in that the letter was not signed by Dazor, it imposed no mutual obligation, and therefore was lacking in consideration; (2) that portion of the letter referring to the retention of personal control of Dazor by Mr. Read "merely defined the period during which the royalty reduction was to remain in effect," and did not constitute an adequate consideration; and (3) the consent to royalty reduction was rescinded by Mr. Perbal in 1954 (apparently reference is had to his letter of January 11, 1954) while the arrangement remained executory.

We find no merit to plaintiffs' contentions. We do not consider the reference in the letter of December 15, 1947, to refer only to the term of the royalty reduction. Instead, when read in context with the other parts of the letter, particularly the second paragraph, the proper meaning is that in consideration of Mr. Read remaining in control of Dazor, plaintiffs agreed to a royalty reduction during said time of control. Also, Mr. Perbal acknowledged in the letter that Dazor must exercise "the greatest possible care in the design and engineering of new products" and that he thought he could be of substantial service in this field. He stated he "would welcome the opportunity to consider, from an engineering standpoint, and to advise on new products and design changes in the old ones, before the same have been put into practice." Mr. Perbal knew that if he developed new inventions which Dazor would use, and if the existing ones were more widely used he would profit thereby, and he included in his letter this statement, "If given this opportunity I feel that I would be adequately compensated for the reduction in the royalty rate, hereby agreed upon." There is no question but that Mr. Read remained in personal control of Dazor and that Dazor did provide Mr. Perbal the opportunity to advise as to new products and design changes. It is true that his new designs and suggestions were not adopted by Dazor, but it had no obligation to do so. We cannot say that Dazor was wrong in not adopting the ideas and suggestions of Mr. Perbal. The important fact is that Dazor did do exactly what plaintiffs said would constitute adequate consideration for their agreement.

This court has held that "A valuable consideration 'may consist of some right, interest, profit or benefit accruing to one party, or some forbearance, loss or responsibility given, suffered or undertaken by the other.' " Charles F. Curry and Company v. Hedrick, Mo., 378 S.W.2d 522. We need not elaborate further on what can constitute adequate consideration, and we conclude that the trial court correctly ruled that there was adequate consideration for the reduction of the royalty rate.

In addition to what we have said concerning the adequacy of consideration, we note that Count II seeks to recover the difference in royalty rate from January 1, 1947 to October 20, 1959, the precise period covered by the claim based on Count I which we have ruled on the basis of an account stated. We can see no reason why that principle should not apply to Count II, irrespective of the question of adequate consideration.

The remaining point in plaintiffs' brief is that "The court should have disregarded the corporate entity and held defendant Read liable jointly with the defendant corporation to the full extent of its liability to plaintiffs."

The transactions of Mr. Read complained of in Count V pertain to an attempt on his part to bring about a transfer of Dazor to twenty-five of his key employees with the most favorable tax advantage to himself. We need not outline the plan in detail. It

is sufficient to say that after the transaction was completed, Mr. Read remained in control of Dazor and he remained as president and general manager. However, the corporation had purchased 88% of the stock for $1,760,000 in cash and notes, and the remaining 12% of the stock was transferred to the twenty-five employees. By Count V plaintiffs sought to impose personal liability on Mr. Read for any judgment it would obtain in this suit against Dazor.

The trial court found that by reason of Civil Rule 55.08, V.A.M.R., the joinder of plaintiffs' claim under Count V with the other claims was authorized, but that the "rule authorizes, and in effect directs, the court to withhold granting such relief despite the permissive joinder of a claim therefor, until substantive rights of the parties make the granting of such relief necessary." The court then held that "Prior to any failure by Dazor to satisfy and discharge a judgment entered herein against it, it is not necessary to adjudicate plaintiffs' right to such supplemental relief."

Plaintiffs are not stockholders of Dazor, and they have no interest in its corporate structure, and are not entitled to challenge it absent prejudice or damage to them. The only possible interest on their part is that they expect to be creditors of Dazor as a result of the judgment in this case. We agree with the trial court that prior to any failure by Dazor to satisfy the judgment finally entered against it, there is no compelling reason to adjudicate plaintiffs' right to the requested supplemental relief. The judgment as to Count V is affirmed.

In summary, the judgment as to Counts I, III and IV is reversed, and as to Count III the cause is remanded for recomputation of royalties; and the judgment as to Counts II and V is affirmed.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion of STOCKARD, C., is adopted as the opinion of the Court.

DONNELLY, Acting P. J., and EAGER and HOLMAN, JJ., concur.

FINCH, P. J., not sitting.