SCAPA DRYERS, INC., Appellant,

v.

ABNEY MILLS, Appellee.

No. 17281.

United States Court of Appeals
Fifth Circuit.

June 30, 1959.

Robert B. Troutman, Griffin Bell, Atlanta, Ga., L. J. Bennet, Brunswick, Ga., L. E. Pedrick, John W. Bennett, Waycross, Ga., Laszlo Kormendi, New York City, for appellant, Spalding, Sibley, Troutman, Meadow & Smith, Atlanta, Ga., Bennett, Pedrick & Bennett, Waycross, Ga., of counsel.

Chas. L. Gowen, Brunswick, Ga., J. Frederic Taylor, New York City, for appellee, James B. Burke, Harold W. Wolfram, George I. Harris, New York City, Gowen, Conyers, Fendig & Dickey, Brunswick, Ga., Burke & Burke, New York City, of counsel.

Before RIVES, JONES and WISDOM, Circuit Judges.

**8**

JONES, Circuit Judge.

Hindle, Son & Co., Ltd., is an English corporation which, among other activities, manufactured looms for the weaving of dryer felts. Dryer felts are thick, wide and long. They are used in the paper making industry and require replacement at periodic intervals. The Hindle looms were patented in England, the United States and other countries. These patents were issued to and held by J. H. Hindle and Thomas Hindle, his son. Thomas Hindle procured patents on dryer felts and associated items. Similar patents were issued to Thomas Hindle and Sam Lord. In 1931 the Messrs. Hindle had made an agreement with Ayers, Limited, a Canadian corporation,[1] by which the Hindles were to assign a one-third interest in certain Canadian patents, were not to grant licenses for the manufacture of dryer felts or offer looms for sale in Canada without the consent of Ayers, nor sell looms in the United States without prohibiting their re-export to Canada.

The Brandon Corporation, a South Carolina corporation, was a textile manufacturer. It included dryer felts as one of its products. In 1936 it negotiated with the Hindles for the purchase of Hindle looms and their exclusive use in the United States. A written proposal of the Hindle Company was made to Brandon but[2] it felt it could not spare

1. "John Henry Hindle and Thomas Hindle, mechanical and Textile Engineers, and both of Haslingden, in the County of Lancaster, England, hereby agree to assign to Messrs. Ayers, Limited, of Lachute, Province of Quebec, Canada, a One Third interest in the following Canadian letters patent for cotton and composite dryer felts and also for looms for weaving such materials, in consideration of a cash payment of Five thousand pounds, receipt of which sum is hereby acknowledged.

[List of Patents]

"The joint owners of the patents, viz., Messrs. Ayers Limited, and John Henry and Thomas Hindle jointly and severally agree as follows:

"The said Thomas Hindle hereby agrees not to license any other person, firm, or company in the Dominion of Canada for the manufacture of the said Cotton and composite dryer felts without the previous consent of the said Ayers Limited.

"The said John Henry Hindle and Thomas Hindle hereby agree not to sell, or offer for sale, in the Dominion of Canada, looms constructed in accordance with the above patents, or otherwise, for weaving cotton dryer felts of any kind, without the previous consent of the said Ayers Limited.

"If the said John H. Hindle and Thomas Hindle, individually or jointly export looms for the manufacture of cotton dryer felts to the United States of America, or any other country, it must be stipulated that such looms will not at any time be re-exported to Canada.

"The said Ayers Limited agree not to license any person, firm or company to manufacture the said looms in the Dominion of Canada, without the previous con-

sent of the said John Henry Hindle and Thomas Hindle."

2. "14th Sept. 1936.
"HINDLE DRYER FELT LOOMS.
"U. S. A. Proposition.
* * *

"General Proposal. In conformity with the policy already established in respect of Gt. Britain, Canada and France, it is not proposed to supply Hindle Looms to more than one individual company in the U.S.A. The prospective Purchaser of such looms will be expected to acquire the exclusive rights in U.S.A. for the use of the Hindle Patent Looms, the manufacture of the various Patented Dryer Felts (including the general technique of their manufacture) and the Link Seam. .

"An essential condition of such arrangement will be the Purchaser's undertaking that no loom or its patented products shall be exported to any country in which similar exclusive rights for the same have been or may be assigned. In a similar manner other users of Hindle Looms have agreed to respect the rights to be acquired in the U.S.A.

"A further condition of such arrangement will be the Purchasers' undertaking that no license to manufacture the Hindle Loom or its components or its patented product shall be issued by the Purchaser without the prior consent in writing of the original Patentees.

"The Patentees will agree to give the Purchasers a first option for the purchase of any patents of improvement that may be granted, but only in respect of U.S.A.

"It is realized that the Purchaser may consider a gradual development necessary or desirable, and with the object of facili-

the money that would be required to buy the Hindle looms. Its interest did not vanish, however, and early in 1939 there was a renewal of discussions. The negotiations on behalf of Brandon were commenced in 1939, as they had been in 1936, by Edward H. Hall. Hall was a representative of Morey Paper Mill Supply Company which handled the selling of dryer felts produced by Brandon pursuant to an arrangement with Woodward, Baldwin & Co. which controlled Brandon and acted as its general sales agent. The negotiations, which had their origin in correspondence, culminated in a conference held in July, 1939, in New York City between the Messrs. Hindle and the president and other representatives of Brandon. As a result of this conference Hindle and Brandon executed the so-called 1939 Memorandum. This Memorandum provided for the sale and delivery by the Hindle corporation to Brandon of two looms at stated prices. The times and place of payment were designated, a paragraph was included which obligated the Hindle corporation to supply Brandon with further looms at then existing prices "plus or minus any intervening difference in the cost of manufacture". A provision captioned "Exclusive Franchise—U. S. A."[3] was

tating such programme, it is proposed that a contract should be entered into for the purchase of six looms within a period of three years commencing from the date of such contract. This contract to provide for the immediate supply of three looms and the purchase of the sole rights of looms and their patented products in the U.S.A. The remaining three looms covered by such contract to be ordered at any time within the specified period at prices equivalent to those quoted herein, plus such increase or minus such decrease as may be indicated as a consequence of altered cost of manufacture due to wages and/or materials, as compared with conditions existing at this date. Further looms to be available to the Purchaser on a similar basis, either before or after the expiration of the three year period.

\* \* \* \* \* \* \*

"Subject to the conditions briefly defined on page 11, the owners will assign to the Purchasers the U. S. Patents enumerated, relating to Looms, Dryer Felts, etc., conveying to the Purchasers the sole and exclusive rights to the Hindle Dryer Felt Looms and their patented products in the U.S.A., in consideration of the payment by the Purchasers of the sum of $50,000 (Fifty Thousand Dollars)."

3. "Exclusive Franchise—U.S.A.
"Agreements will be entered into by the responsible parties making you the exclusive user in U.S.A., of Hindle Dryer Felt Looms (regardless of whether such Looms are constructed under existing Patents or otherwise), and assigning to you the following U.S. Patents covering Looms, Cloths, Seams, etc.:—

| | | |
|---|---|---|
| No. 1630428—1927 Looms | J. H. & T. Hindle |
| 1678434—1928 Looms | J. H. & T. Hindle |
| 1687865—1928 Looms | J. H. & T. Hindle |
| 1801081—1931 Dryer Felts | T. Hindle |
| 1812206—1931 Looms | J. H. & T. Hindle |
| 1812148—1931 Dryer Felts | T. Hindle |
| 1834343—1931 Dryer Felts | T. Hindle |
| 1976169—1934 Sew. Machine | T. Hindle |
| 1994280—1935 Dryer Felt | T. Hindle |
| 2010302—1935 Link Seam | T. Hindle & S. Lord |
| 2066974—1937 Link Seam | T. Hindle & S. Lord |
| (Pending) 1939 Dryer Felt (P.M.) | T. Hindle & S. Lord |

"The consideration required for the above U.S. rights is the sum of:— £5,000.
"We suggest that payment of this particular item shall be made by 20% upon signing of the contract, with four further payments each of 20% of the total sum at consecutive intervals of six months, thus spreading the payments over two years.
"It will be our object, of course, to maintain close cooperation with you, exactly as we have during the last twelve years with Messrs. Ayers, Ltd., of Canada."

incorporated. The primary issues of this litigation depend upon the interpretation and legal effect to be given to this provision. Except for a supplemental letter, which is not here material, the 1939 Memorandum is the only written agreement between the Hindle corporation and Brandon, or its successor in interest, Abney Mills, which bears upon this controversy. Assignments of the patents described in the Memorandum were made to Brandon.

Brandon merged with Abney Mills, the appellee, and all of Brandon's rights under the Memorandum became vested in Abney Mills. The United States patents on looms which had issued to the Hindles had all expired in 1948. In 1948 the appellant, Scapa Dryers, Inc., was incorporated in Georgia. Its stockholders are Scapa Dryers, Ltd. and Ayers Limited. Scapa Dryers, Ltd., is an English corporation manufacturing dryer felts in England on Hindle looms. The Messrs. Hindle are associated with it. Ayers Limited is the Canadian corporation which manufactures dryer felts on Hindle looms. The Hindles are not connected with Ayers. Scapa Dryers, Inc., the appellant, set up a plant in Waycross, Georgia, where it embarked upon the manufacture of dryer felts on Hindle looms. This suit followed. Abney Mills asserted that by the 1939 Memorandum, of which the Georgia Scapa corporation had knowledge, it acquired an exclusive right to the use of Hindle dryer felt looms in the United States in perpetuity or for as long as it should maintain its corporate existence under its perpetual charter, that Scapa of Georgia wrongfully and tortiously interfered with the contractual relationship and deprived it of the economic advantage resulting from the agreement incorporated in the Memorandum. Damages, an accounting and injunctive relief were sought. The appellant contended that the Memorandum, properly construed, granted Brandon and Abney, its successor by merger, no exclusive franchise beyond the life of the patents, and if the agreement be construed as attempting to grant an ex-clusive perpetual franchise it would be contrary to public policy, violative of the anti-trust laws, and unenforceable.

Testimony, oral and documentary, was received. Thomas Hindle testified that the Hindles did not intend to grant to Brandon an exclusive right to use Hindle looms for any period beyond the term of the patents. The President and General Manager of Brandon, Mr. C. E. Hatch, testified that he expected that the exclusive franchise would be perpetual and based his expectations solely on the language of the agreement. It will be remembered that the 1939 renewal of negotiations on behalf of Brandon with the Hindles was made by Hall and much of the correspondence for Brandon was written by him. On April 10, 1939, he requested authority from Thomas Hindle to make patent investigations in the United States. In the course of the letter it was said, "It strikes me that we will actually be paying the franchise cost for what these patents are worth in this country, and we feel a careful investigation of these patents is entirely in order, and hope you may see our point." Again, during the same month he wrote,

"The first reactions of Mr. Hatch and Mr. Baldwin are too much money involved. They have, some time ago, got price on one loom from Compton & Knowles of Worcester, Mass., and of course this price is way below your loom prices. Furthermore, they point out that the only felt Patent which it seems we will definitely need under our program, will be the Porous Matt felt, because the ordinary asbestos felts, such as are made by Hill, and which would also be made on your looms, are not Patented nor Patentable.

"Therefore, the 5,000 pounds franchise cost seems to pare down to the one Porous Matt Patent, which may still simply be Patent applied for in the United States, plus the franchise on the Patented looms themselves. I must admit that when this is boiled down to these facts,

and unless I am incorrect, the franchise price does seem high."

Other letters by Hall were of the same tenor suggesting that the franchise payment was to be for the patents and hence for the duration of the patents. Mr. Hatch wrote to his company's attorney on August 2, 1939, saying, "There is no question but that a loom can be built by any other manufacturer which will satisfactorily weave Cotton Dryer Felts without infringing on any existing patents. We have never thought that owning the United States patents to the Hindle Looms would prohibit other felt manufacturers making satisfactory Dryer Felts, but we do believe that we will have a four or five year jump on the other manufacturers and this is all that we can hope for". Thus there is much doubt as to the correctness of a statement of Mr. Baldwin, of Woodward, Baldwin & Co., made in a letter to the Morey Company that "I feel sure that your Mr. Hall thinks Brandon should have a paper of some sort from Hindle outlining his agreement that no further Hindle looms will ever be sold or operated in this country."

The district court held that by the "Exclusive Franchise" clause Brandon and its successor Abney Mills had been given an exclusive right in perpetuity, or for so long as the right should be exercised, to manufacture dryer felts on Hindle looms. Scapa of Georgia appealed.

Much has been said by the parties as to whether consideration should be given to the offers and representations made during the 1936 negotiations. The conclusions we reach make it unnecessary to pass upon the contentions made in connection with this phase of the case. We think that the 1939 discussions, which culminated in the July agreement, were new negotiations and not a continuation of those of 1936. Nor do we find it necessary to consider the proposition, urged by the appellee, that the fact that Ayres Limited continues to be the exclusive Hindle operator in Canada requires the construction that the contract with Brandon was intended to grant an unlimited right of exclusive use in the United States.

The district court construed the agreement as a valid enforceable contract prohibiting Hindle, in perpetuity or for as long as Brandon or its successors should be in business, from selling in the United States looms manufactured by Hindle for the weaving of dryer felts. Such an agreement would restrict Hindle in the sale of its manufactured looms. Competition would be limited. The agreement as found by the district court would be in restraint of trade. An agreement in restraint of trade is illegal at common law or under the Sherman [4] and Clayton Acts [5] only if the restraint is unreasonable. The test as to whether or not a restraint of trade is unreasonable has been stated in this manner:

"A restraint of trade is unreasonable, in the absence of statutory authorization or dominant social or economic justification if it

"(a) is greater than is required for the protection of the person for whose benefit the restraint is imposed, or

"(b) imposes undue hardship upon the person restricted, or

"(c) tends to create, or has for its purpose to create, a monopoly, or to control prices or to limit production artificially, or

"(d) unreasonably restricts the alienation or use of anything that is a subject of property, or

"(e) is based on a promise to refrain from competition and is not ancillary either to a contract for the transfer of good-will or other subject of property or to an existing employment or contract of employment." Restatement, Contracts § 515.

The concept of reasonableness, by which the enforceability or unenforceability of

---

4. 15 U.S.C.A. § 1 et seq.

5. 15 U.S.C.A. § 12 et seq.

an agreement in restraint of trade is determined, is not to be measured by any fixed formula of legal interpretation. The rules are but guides to decision. The reasonableness of the restraint is to be determined by the circumstances of the case and the particular contract involved in it. Gibbs v. Consolidated Gas Co., 130 U.S. 396, 9 S.Ct. 553, 32 L.Ed. 979.

The restraining covenant of "exclusive user" was ancillary to the sale of the two looms by Hindle to Brandon and the assignment of the patents.

■ The contractual limits or absence thereof, upon the period of time and the territorial extent of the restriction are factors to be considered in determining reasonableness. They are not, by the present trend of the authorities, fixed rules of decision. 17 C.J.S. Contracts §§ 238–250, pp. 622 et seq.; 6 Corbin on Contracts, 472, § 1381; Annotation 45 A.L.R.2d 77; Annotation 46 A.L.R.2d 119. But, it may be said, the longer the period of time and the larger the extent of the area, the greater will be the likelihood that the restraining covenant will be regarded as unreasonable and unenforceable.

Since Hindle agreed to assign its United States patents to Brandon it can hardly be said that it was unreasonable to include the entire United States as the territory for which the exclusive use was granted. As to the question of time the problem has a dual aspect, first, whether the district court correctly found that there was an intent of the parties that the exclusive franchise should be for so long as Brandon or its successors should be in the dryer felt business or, in other words, of indefinite or perpetual duration; and second, if so intended, could the agreement withstand a charge of invalidity. Our task would be easier if the parties, by the agreement, had fixed or attempted to fix the period for which the exclusive user was to continue. The duration of the agreement was neither specified in the agreement nor discussed at any time during the negotiations. When we consider whether the interest of Brandon, now Abney Mills, requires a perpetual right of exclusive user we look to the purpose for which the Hindle looms were purchased and the exclusive user was acquired. The felts which Brandon had been making were not such as could compete with those of other manufacturers. It was feared by Brandon in 1937 that unless it was able to make a satisfactory asbestos felt it would be entirely out of the dryer felt business in a few years. In the same year the mills prepared to operate on a three-day week. The Hindle looms were then regarded by Brandon and are now regarded by Abney Mills as the best dryer felt looms obtainable. Brandon believed that the use of the Hindle looms would give it a commanding competitive position in the American dryer felt market. The President of Brandon, about a week after the deal with Hindle was closed, wrote the Company's attorney and, commenting upon the patents, said, "We do believe that we will have a four or five year jump on the other manufacturers and this is all that we can hope for." The patents expired in 1948 and so had a remaining life of about nine years at the time of the transaction. We conclude that the interest which Brandon sought to protect was the exclusive use provided by the patents and for the remaining period covered by the patents. That protection it has had.

■■ Construing the agreement as would Abney Mills and as did the district court, Hindle would be forever prohibited from selling looms in the United States except to the extent, if at all, Brandon should be a customer. There was no agreement by Brandon ever to buy another loom. That it did so is true but to determine the intent of the parties we look at the situation of the parties and their undertakings at the time their agreement was made. We think the inference is unwarranted that Hindle intended to so limit its potential market by forever excluding itself from what would perhaps be its most promising trade area.

By the patents the Hindles had a monopoly on the looms. This monopoly is sought to be extended and perpetuated by Abney Mills, to the extent of the exclusion of Hindle and those claiming under it or using looms made by it. Such an extension of the patent monopoly is in conflict with the policy of the patent laws. By the decision in Scott Paper Co. v. Marcalus Manufacturing Co., Inc., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, rehearing denied 326 U.S. 811, 66 S.Ct. 263, 90 L.Ed. 495, it was held that a contract between a patentee and the assignee of the patent which attempts to exclude the assignor-patentee from using the patented article after the expiration of the patent is contrary to the public policy laid down by our patent laws and consequently is unenforceable. The consuming public is entitled to the benefits which flow from the free and unrestricted use and development of the invention by others, including the assignor, after the expiration of the patent. This is a part of the consideration for which the monopoly for a limited duration is granted. In the course of its opinion the Court said:

"By the patent laws Congress has given to the inventor opportunity to secure the material rewards for his invention for a limited time, on condition that he make full disclosure for the benefit of the public of the manner of making and using the invention, and that upon the expiration of the patent the public be left free to use the invention. [Citing authorities]. As has been many times pointed out, the means adopted by Congress of promoting the progress of science and the arts is the limited grant of the patent monopoly in return for the full disclosure of the patented invention and its dedication to the public on the expiration of the patent. [Citing authorities].

"The aim of the patent laws is not only that members of the public shall be free to manufacture the product or employ the process disclosed by the expired patent, but also that the consuming public at large shall receive the benefits of the unrestricted exploitation, by others, of its disclosures. [Citing authority]. If a manufacturer or user could restrict himself, by express contract, or by any action which would give rise to an 'estoppel', from using the invention of an expired patent, he would deprive himself and the consuming public of the advantage to be derived from his free use of the disclosures. The public has invested in such free use by the grant of a monopoly to the patentee for a limited time. Hence any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws. And for the same reason a stranger, such as respondent Marcalus, cannot, by securing and assigning a patent on the invention of the expired Inman patent, confer on petitioner any right to deprive the public of the benefits of the free use of the invention for which the public has paid by the grant of a limited monopoly.

"By the force of the patent laws not only is the invention of a patent dedicated to the public upon its expiration, but the public thereby becomes entitled to share in the good will which the patentee has built up in the patented article or product through the enjoyment of his patent monopoly. Hence we have held that the patentee may not exclude the public from participating in that good will or secure, to any extent, a continuation of his monopoly by resorting to the trademark law and registering as a trademark any particular descriptive matter appearing in the specifications, drawings or claims of the expired patent, wheth-

er or not such matter describes essential elements of the invention or claims. [Citing authorities].

"It is thus apparent that the patent laws preclude the patentee of an expired patent and all others including petitioner from recapturing any part of the former patent monopoly; for those laws dedicate to all the public the ideas and inventions embodied in an expired patent. They do not contemplate that anyone by contract or any form of private arrangement may withhold from the public the use of an invention for which the public has paid by its grant of a monopoly and which has been appropriated to the use of all. The rights in the invention are then no longer subject to private barter, sale, or waiver. [Citing authorities]." 326 U.S. 255–257, 66 S.Ct. 104.

The Scott Paper Co. case has been criticized and referred to as the "Dreadful Scott decision". Lechner, Estoppel Against Patent Assignors—The Scott Paper Company Case. 28 J.Pat.Off.Soc'y 325. Cf. 4 Toulmin, Anti-Trust Laws 194, § 7.24. Whether or not the decision is sound, and we think it is, we are bound by it and the doctrine which it states is a principle governing the decision in the case before us.

■■■ If the district court's construction of the meaning of the contract be followed, we would have no choice but to hold it invalid. Where an agreement is susceptible of two constructions, one of which would render the contract invalid and another which would sustain its validity, the latter construction is to be preferred. W. C. Shepherd Co. v. Royal Indemnity Co., 5 Cir., 1951, 192 F.2d 710. So we conclude that Hindle and Brandon did not intend that Brandon's exclusive rights to the use of Hindle looms should continue beyond the time when all of the patents described in the agreement had expired. The rights under the patents have terminated and so has the right of exclusive user granted to Brandon and assigned by it

to Abney Mills. Therefore the judgment of the district court for the appellee was erroneous. That judgment is reversed and judgment is here rendered for the appellant.

Reversed and rendered.