**Dana I. KESTENBAUM,**
**Plaintiff-Appellee,**

v.

**FALSTAFF BREWING CORPORATION,**
**Defendant-Appellant.**

**No. 76–4290.**

United States Court of Appeals,
Fifth Circuit.

June 23, 1978.

As Modified on Denial of Rehearing and Rehearing En Banc Aug. 17, 1978.

Max Hendrick, III, John L. Carter, Houston, Tex., for defendant-appellant.

Jack N. Price, Austin, Tex., Ed P. Magre, Cameron, Tex., for plaintiff-appellee.

Before TUTTLE, COLEMAN and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This is a vertical restraint antitrust case. The plaintiff, Dana I. Kestenbaum, a beer distributor, sued his supplier, Falstaff Brewing Corporation, alleging violations of Section 1 of the Sherman Act, 15 U.S.C.A. § 1. The jury returned a verdict for Kestenbaum. We hold that Kestenbaum's proof of damage from price-fixing was inadequate; he failed to show that Falstaff's local advertising, bar spending, and warehouse requirements, and use of its power to approve the purchaser of his business, had any anticompetitive effect; his proof of lost goodwill was contrary to the law of the case; but various other allegations of trial error are unpersuasive. We remand for a new trial, the only post-verdict remedy which Falstaff sought in the district court.

## I. The Proof

The jury returned a verdict for the plaintiff, and it is our duty to view the facts in the light most favorable to his case. *Boeing Co. v. Shipman*, 411 F.2d 365, 374–375 (5th Cir. 1969) (en banc).

This dispute arises from a decline in the thirst for Falstaff beer in Texas during the 1960's. At that time plaintiff Dana I. Kestenbaum was the Falstaff distributor for four Texas counties: Milam, Robertson, Brazos, and Burleson, all of which are located slightly north of the Houston-Austin highway. Kestenbaum's family had been in the business since 1934, and in the early 1960's, he had earned net profits as high as $12,000 per year.

In 1967, Falstaff and Kestenbaum reduced their relationship to writing in the form of franchise agreements renewable yearly. The agreements designated geographical territories which would be Kestenbaum's "primary area[s] of interest." He pledged to invest three cents per case in local advertising, when he was financially able to do so. The agreements gave Falstaff the right to terminate at any time, on 30 days' notice, by payment of a penalty. The agreements allowed Kestenbaum to assign his rights to another distributor, but required Falstaff's approval of the assignee's "sales management and financial ability to perform as a Falstaff distributor."

Although Kestenbaum enjoyed a 10–12 percent share of the beer market in his territory, his sales, like those of other Falstaff distributors in Texas, had begun to fall. In 1968, he barely broke even. In 1969 he suffered a loss. In late 1970 and early 1971, he sold his business. The Milam territory went to one neighboring Falstaff distributor, and the Robertson area went to another. He sold his Brazos and Burleson business to his local manager. In all, he realized $30,000 from the sale, in addition to recovering close to $80,000 for his capital investment.

In 1972, he brought this antitrust suit, and claimed damages for the period back to 1968 allowed by the statute of limitations,

15 U.S.C.A. § 15b. This Court reversed a general verdict in his favor. *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976). The alleged violations of the Sherman Act were the same at both trials:

A. *Price-fixing.* Kestenbaum testified that Falstaff placed a ceiling on the prices at which he resold the beer. *See Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). In an earlier period, Falstaff had dictated his prices explicitly. Later it instructed him to "meet competition." Pursuant to Falstaff's instructions, he collaborated with other beer wholesalers in his area to establish price schedules. When this "competitive" price went up, Falstaff claimed half of any increase. In the first trial, Kestenbaum claimed injury from those assessments by Falstaff. The Court held them legal. The general verdict was reversed for failure to show injury or damage. *Kestenbaum*, 514 F.2d at 694–695; *see Newberry v. Washington Post Co.*, 438 F.Supp. 470, 482 (D.D.C.1977) (Gesell, J.).

On retrial, Kestenbaum gave new testimony and offered a new damage theory. Previously he had testified that in the early 1960's, Falstaff had refused his request to raise his prices by a nickel a case and to keep the proceeds for himself to cover certain expenses. On retrial, he asserted that similar incidents took place in 1966 and 1970. Kestenbaum claimed injury from the inability to raise his price, and calculated damages of $15,741.70 by counting up a nickel for each case sold from 1968 forward. While he testified that he did not know what a nickel increase would have done to his sales volume, he also indicated that, because the distributors of Pearl, Lone Star, Budweiser, and Schlitz were willing to go along with the price hike, the increase would not have reduced the quantity sold. The jury found Falstaff had engaged in price-fixing and awarded damages of $5,000.

B. *Territorial Restrictions.* Kestenbaum testified that Falstaff confined him to the territories named in his distributorship, and would not let him service 11 customers on the border of Brazos County who were assigned to another distributor. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). As in the first trial, however, Kestenbaum offered no proof of monetary injury from sales lost, and the trial court instructed the jury not to include the claim of territorial restrictions in assessing damages. *See Kestenbaum*, 514 F.2d at 697.

C. *General Combination to Restrain Trade.* As additional "overt acts" in furtherance of a conspiracy to restrain trade, Kestenbaum challenged Falstaff's requirements that he advertise locally, engage in bar spending, and maintain three warehouses rather than one. In the words of his attorney, these were "acts of harassment" which "caused him excessive expenditures, without commensurate increase in business."

Falstaff encouraged Kestenbaum to maintain warehouses in Cameron, Milam County; Caldwell, Burleson County; and Bryan, Brazos County. In fact, the territories were drawn in 1967 on the basis of the three warehouses he then had. Kestenbaum started the warehouse in Caldwell, because he thought it would help him with his sales if he were a visible member of the local business community. The warehouses, however, were not effective for that purpose. Shortly before he sold the business, he closed the Caldwell warehouse and his purchaser did not reopen it. The distributor who bought the Milam territory abandoned the warehouse there. Despite the inefficiency of maintaining three separate warehouses in a declining market, Falstaff refused to let him consolidate into one warehouse unless he moved to Bryan, the growth area in his territory and the place where a central warehouse would be best located. Kestenbaum rejected that proposal because he did not want to leave Cameron, the community where he had grown up and where his children were in school. The jury found that Falstaff's conduct with respect to Kestenbaum's warehouses was un-

reasonable, and awarded him $24,000 of the $47,603.36 he estimated he would have saved by closing down two of his warehouses in 1968.

Falstaff required Kestenbaum to engage in "bar spending," or visiting tavern outlets and buying free Falstaff for all those present. Though Kestenbaum found this practice advisable at first, he later determined it was of "no benefit" to him. Similarly, he thought the requirement that he spend three cents per case in distributing Falstaff-prepared advertising on the local radio and newspapers did him no good. Kestenbaum testified his promotional efforts were of no avail when Falstaff was producing bad beer, which spewed when opened, and Falstaff's national advertising was not producing a good brand name image. An expert witness, Dr. Stanley Block, professor at Texas Christian University, testified that national advertising was the "real clout" in the beer business. Falstaff's requirements that Kestenbaum promote the beer locally deprived him of the ability to make optimum business decisions. The jury found the requirements unreasonable. They awarded him $3,435.00 of the $8,235.03 he claimed in unnecessary advertising expense, and $8,000.00 of $16,397.26 he claimed he wasted on bar spending.

D. *Restraints on Sale of Business.* Kestenbaum found a willing buyer, Marshall Durr, who offered to buy his Milam and Robertson County territories. Falstaff refused to approve Durr, though it did not question his managerial competence or financial soundness. Falstaff preferred that Kestenbaum sell the territories to existing Falstaff distributors. Falstaff suggested that $25,000 was all Kestenbaum should receive for the goodwill value of the business. Kestenbaum eventually received $30,000, but lost $1,000 by being unable to sell to Durr. In Dr. Block's opinion, the approval clause was, like the 30-day notice provisions, an enforcement device. Falstaff's ability to keep the sales price low would guarantee that a purchaser could earn an adequate return without being tempted to break out of the territorial and other restraints which Falstaff had imposed on Kestenbaum.

Kestenbaum claimed that if his sale had not been subject to Falstaff's approval, and if he had not been required to engage in unnecessary warehouse expenses, the goodwill value would have been much greater. The trial judge instructed the jury, in accord with the prior opinion of this Court, that goodwill was to be determined through consideration of two elements:

First, the profit the business has made over and above an amount fairly attributable to the return of a capital investment and to the labor of the owner, and two, the reasonable prospect that this additional profit will continue into the future, considering all circumstances existing and known as of the date of the violation, if any.

*See Kestenbaum,* 514 F.2d at 697–699. Kestenbaum testified that, without Falstaff's restraints, the goodwill value of his business would have been $49,000 at a minimum. He based that on an estimate of the profit he could have made, in addition to his $7,800 annual salary. He indicated that a territory he sold for $8,000 could have earned $14,000 profit per year if operated correctly. He admitted, however, that his $7,800 salary figure was too low and the true value of his labor to the company was closer to $20,000 a year. He indicated that his $49,000 figure made no allowance for a return on his $80,000 capital investment.

Dr. Block offered an additional estimate of goodwill value. Although Kestenbaum's business earned a net loss over the 1968–1971 period, Dr. Block estimated that, without unnecessary warehouse, bar spending, and local advertising expense, an annual profit of $24,000 could have been realized. He testified that it was customary to arrive at goodwill by multiplying profit by a multiple of from 3 to 10. A conservative multiplier of 2.5 would produce a price of $61,-000, and in his opinion a goodwill value of $70,000 would have been appropriate. On cross-examination, Dr. Block revealed that his calculation of yearly profit made no provision for a return on capital, and he

said he disagreed with the formula which the court later instructed the jury to be correct.

In the first trial, the district court instructed the jury that Falstaff's restraint on the sale of Kestenbaum's distributorship was illegal *per se*. This Court reversed, and held that the rule of reason applied. A manufacturer has a legitimate interest in keeping the price low to ensure a purchaser would have a chance to realize a reasonable return on his investment, and the jury should decide whether a restraint was adopted for good business reasons and not to injure competition. *Kestenbaum*, 514 F.2d at 695–697. On retrial, the jury rejected Falstaff's defense and found Falstaff's use of its approval power to be an unreasonable restraint of trade. It awarded Kestenbaum $19,000 in damages. When trebled, the overall damage award was $178,305.00.

## II. *Price-fixing*

Falstaff challenges the district court's failure to give a requested instruction concerning the statute of limitations as it applied to price-fixing, and asserts the court should have directed a verdict in its favor because Kestenbaum's evidence of damage from price-fixing was unduly speculative.

■ We discern no error in the omission of Falstaff's instruction. Falstaff strove mightily to discredit Kestenbaum's testimony that Falstaff had denied his request to raise his prices in 1966 and 1970, the latter date being within the statute of limitations. Seemingly contrary impeaching testimony was read to the jury no less than three times. The instruction Falstaff sought would have specifically linked the statute of limitations to the price-fixing claims.

The district court, however, adequately instructed the jury on the general question of the statute of limitations, as applied to both liability and damages. Given the repetitive nature of Falstaff's proof, and counsel's argument, the jury can hardly have failed to grasp the idea that it needed to find that Kestenbaum was restrained during the 1968–1970 period for which he claimed damage. Even if Kestenbaum had not made the subsequent requests, the denial in the early '60s could have carried over to coerce him later, making Falstaff liable. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

■ The challenge to Kestenbaum's proof of damage, however, has merit. When asserting injury from the imposition of price ceilings, the plaintiff must show when prices would have been raised, by what amount, and approximately what sales would have been at the higher price. *See Newberry v. Washington Post Co.*, 438 F.Supp. 470 (D.D.C.1977). Kestenbaum's sales projection rested on nothing but his own speculation. *See Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1371 & n.25 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). Unlike the plaintiff's testimony in *Greene v. General Foods Corp.*, 517 F.2d 635, 661–662 & n.21 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976), Kestenbaum's estimate was not bolstered by the calculations of an expert.

■ In that posture, it was incumbent upon Kestenbaum to provide a reasonable basis for his assertion that no sales would have been lost even if he had raised his prices by a nickel per case. *See Household Goods Carriers' Bureau v. Terrell*, 452 F.2d 152, 159–160 (5th Cir. 1971) (en banc). Instead, Kestenbaum relied upon a theory which was deficient as a matter of law. He reasoned that if Falstaff had let him, he would have raised his prices in concert with the local beer distributors of other brands, an admitted antitrust violation.

That testimony clearly ran contrary to the court's instruction to the jury that it was to

calculate the difference between the economic position Plaintiff's business would have been in had it been allowed to operate in a freely competitive market without the illegally imposed restraints, if any, compared to the economic position Plaintiff's business actually was in.

A conspiracy of local distributors is hardly a "freely competitive market."

Kestenbaum argues that the local conspiracy was approved by Falstaff, Falstaff has never raised this precise objection to Kestenbaum's proof, and in any event Kestenbaum's participation in illegal acts or *in pari delicto*, cannot be made a defense. *See Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

We think Falstaff's approval is irrelevant, and a manifest miscarriage of justice would result if Kestenbaum were allowed to recover on this basis. *See Martinez v. Mathews*, 544 F.2d 1233, 1237 (5th Cir. 1976). This is not an *in pari delicto* situation. Nor is it a case where minimum price-fixing by a distributor is set up as a justification for maximum price-fixing by a manufacturer. *See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951). The argument is not that Kestenbaum is barred from any recovery because he participated in antitrust violations. Rather, it is that he cannot assume for the purposes of establishing damages that some, but not all, of the violations never took place. Damage in an antitrust case must compensate for an injury to the interests protected by the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Kestenbaum's theory would compensate him for his inability to participate in a local monopoly and should not have been submitted to the jury.

Looking at the evidence most favorably to the plaintiff, it is legally insufficient to support the award for damages resulting from price-fixing. The fact that the award was less than the amount calculated by Kestenbaum does not render sufficient evidence that is otherwise insufficient.

### III. *Anticompetitive Effect*

■ Kestenbaum asserted antitrust violations by vertical restraints of trade are judged by the "rule of reason." The content of the rule of reason in vertical restraint antitrust cases is not clearly estab-lished. Most litigation has involved practices held in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), to be illegal *per se*. The Supreme Court only last year abandoned the *per se* approach. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). *See* Posner, *The Rule of Reason and the Economic Approach: Reflections on the* Sylvania *Decision*, 45 U.Chi.L.Rev. 1, 15 (1977).

In past rule of reason cases, this Court has relied on the formulation which asks whether the restraint "tends to or is reasonably calculated to prejudice the public interest." *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 897 (5th Cir. 1968). Our decisions, however, give little content to the "public interest" concept. In attempting to shape it, the plaintiff has relied on a definition of unreasonable restraints from Restatement of Contracts § 515, cited in *Scapa Dryers, Inc. v. Abney Mills*, 269 F.2d 6, 11 (5th Cir.), *cert. denied*, 361 U.S. 901, 80 S.Ct. 209, 4 L.Ed.2d 156 (1959), which in part at least conflicts with *Continental T.V.*

We think the better course was charted by Judge Clark in the prior opinion in this case, which treated "public injury" as a synonym for "injury to competition." The emphasis on market considerations conforms to the purpose of the Sherman Act and provides a more certain basis for distinguishing public from private injury. The Supreme Court has rejected a "public interest" defense to anticompetitive conduct, *National Society of Professional Engineers v. United States*, ― U.S. ――, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), and the plaintiff's case should be similarly restricted to proof of market impact. That Court's vertical restraint cases point in this direction. A footnote in *Continental T.V.* cited the historic formulation of *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918), which asks whether a restraint "promotes competition or whether it is such as may suppress or even destroy competition." 433 U.S. at 49 n.15, 97 S.Ct. at 2558. In an aspect of *Schwinn* left undisturbed by *Continental*

*T.V.*, the Court said that under the rule of reason the test was whether "the effect upon competition in the marketplace was substantially adverse." 388 U.S. at 375, 87 S.Ct. at 1863.

So interpreted, the rule of reason standard hinges the ultimate legality of a restraint on whether the plaintiff has demonstrated an anticompetitive effect which is not offset by a need to achieve a procompetitive benefit or justification. *See Schwinn*, 388 U.S. at 380–382, 87 S.Ct. 1856; ABA, Vertical Restrictions Limiting Intraband Competition 53–71 (1977). The starting point, however, must be a showing that the restraint tends to or is reasonably calculated to inflict some injury on competition.

A plaintiff may demonstrate anticompetitive effect in many ways. Increased concentration, as shown by a change in relative market shares, may be an indicator, or a change in prices, output or quality which evinces market power may be significant. *See Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.*, 383 F.2d 97, 104 (5th Cir. 1967) (distribution monopolized, markup abnormally high, market under-served, public injury shown), *cert. denied*, 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870 (1968); *Sandidge v. Rogers*, 167 F.Supp. 553, 563 (S.D.Ind.1958). The emphasis, however, under the rule of reason is on market impact. Dealings between a manufacturer and its agents may be arbitrary, unfair, or lacking in good business judgment, but, without more, they will not violate the Act. *See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *Wilson v. IBE Industries, Inc.*, 510 F.2d 986 (5th Cir. 1975). The Sherman Act is not a "panacea for all business affronts which seem to fit nowhere else." *Scranton Construction Co. v. Litton Industries Leasing Corp.*, 494 F.2d 778, 783 (5th Cir.), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1974). Rather it is a charter of economic freedom which operates within the "objective benchmarks" of market considerations. *Continental T.V.*, 433 U.S. at 53 n.21, 97 S.Ct. 2549.

### A. *Local Advertising, Bar Spending, Warehouses*

In this case, Falstaff asserts Kestenbaum failed to prove Falstaff's local advertising, bar spending, and warehouse requirements had any adverse effect on competition. Because such a showing is an essential predicate to proving an unreasonable restraint of trade, Falstaff maintains the trial court erred in submitting the legality of the restraints to the jury. Precedent provides little guidance. The extent to which a manufacturer may impose restraints on the "competitive style" of an independent retailer has received little judicial scrutiny, and only brief discussion in the treatises. *See* Antitrust Adviser § 3.40 at 117 (C. Hills ed. 1971); L. Sullivan, Antitrust 497–498 (1977).

1. *Direct Effect.* The first inquiry is whether the requirements, by themselves, injure competition. Such a result would appear improbable. Absent a showing of excessive product differentiation, advertising, and other promotional devices are thought to advance competition, not to impair it. *See Bates v. State Bar*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). It is perhaps for this reason that at least three courts have summarily decided that requiring a dealer to advertise does not violate the Sherman Act. *Nelligan v. Ford Motor Co.*, 262 F.2d 556 (4th Cir. 1959); *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.*, 403 F.Supp. 643, 653 (E.D.Pa.1975); *Sunrise Toyota, Ltd. v. Toyota Motor Car Co.*, 55 F.R.D. 519, 532 (S.D.N.Y.1972). *Cf. Johnson v. Joseph Schlitz Brewing Co.*, 33 F.Supp. 176 (E.D.Tenn.1940), *aff'd*, 123 F.2d 1016 (6th Cir. 1941) (per curiam) (conspiracy *not* to solicit customers violates antitrust laws). Unlike territorial restraints, the requirements do not affect the number or concentration of beer distributors in the market. Furthermore, they seem calculated to increase sales, and thus enhance competition, not reduce it.

Kestenbaum's theory of "unreasonableness" was simply that the requirements were ineffectual tools for promoting the sale of beer. He willingly engaged in bar

spending and local warehouse maintenance so long as he thought they were advancing his sales. But when they ceased to do so, Falstaff's policy unnecessarily raised his costs, and hampered his ability to sell Falstaff's product in what he considered to be the optimum fashion.

While the antitrust law has given more than a mere nod to the importance of business autonomy, respect for independence cannot justify finding a violation when no adverse impact on competition is shown. The Supreme Court expressly rejected business autonomy as the basis for a *per se* rule against territorial restraints imposed on distributors who own the goods they sell. *Continental T.V.*, 433 U.S. at 53 n.21, 97 S.Ct. 2549. Followed to its logical conclusion, Kestenbaum's theory would subject a manufacturer to treble damage liability for any provision in a franchise agreement which turned out, in retrospect, to have been a bad business decision. This is not the purpose for which the Sherman Act was designed.

Kestenbaum seeks to draw on the cases which infer from certain business behavior, notably increased prices and reduced output, that a restraint is anticompetitive. *See, e. g., Sandidge v. Rogers*, 167 F.Supp. 553, 563 (S.D.Ind.1958). He argues, for example, that increasing his costs necessarily affects his resale price, and so shows an injury to competition.

Kestenbaum's position mistakes the symptom for the disease. The reason increased prices and reduced output are condemned is that they are the classic indicia of monopoly. *See* E. Gellhorn, Antitrust Law & Economics 95–98 (1976). When caused by abuse of market power, they may provide evidence of anticompetitive effect. Here, however, Kestenbaum has never alleged that Falstaff has a strong market position, or even that it acted with any anticompetitive intent. Instead, Kestenbaum's testimony fully establishes an explanation for his increased prices that has nothing to do with market control: Falstaff made bad beer and so handicapped his local promotional efforts. That Falstaff made unwise business decisions which caused an unnecessary increase in the delivered price of its beer cannot in this context be taken as evidence of anticompetitive behavior. Falstaff's falling market share would seem to indicate the forces of competition were fully at work, punishing Falstaff for its mistakes.

2. *Connection with Other Restraints.* Kestenbaum's attorney also argued that the warehouse requirement was illegal because it was an "overt act" in furtherance of the territorial restriction scheme. Kestenbaum had three territories, and three corresponding warehouses which Falstaff allegedly would not let him close. That, however, mischaracterizes Kestenbaum's testimony. Kestenbaum did not say Falstaff required him to keep a warehouse in each of his three territories. He said Falstaff forced him to keep all three warehouses open unless he would consolidate his operations and move to Bryan, which was unreasonable because he had always lived in Cameron and his children were in school there.

Even taken at face value, the warehouse theory is deficient. In the case upon which Kestenbaum principally relies, *Adolph Coors v. FTC*, 497 F.2d 1178, 1188 (10th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975), the court held a warehouse policy illegal because it helped the manufacturer enforce territorial restrictions. The practice in question there, however, was the manufacturer's refusal to sell beer to independent warehouses. By forcing retailers to buy directly from it, the manufacturer could readily police their compliance with the manufacturer's allocation of retail markets.

Neither Kestenbaum nor his expert witness indicated any way in which Falstaff's warehouse policy did or would help it enforce territorial restrictions. In fact, three distant warehouses would appear to be less geographically confining than one central warehouse. Furthermore, the evil of territorial allocation is the restriction on the distributor's ability to sell *outside* his territory. Requiring a dealer to provide adequate service *inside* a territory does not

injure competition. If anything, it increases competition by stepping up interbrand rivalry within the territory.

### B. *Restraints on Sale of Business*

Kestenbaum theorized that anticompetitive effect could result from an abuse of Falstaff's power to approve the purchaser of his business, but the testimony upon which he relies for proof of anticompetitive effect is so dependent upon erroneous hypotheses that the jury's verdict on this aspect of the case must also be set aside.

Dr. Block, testifying in the abstract, indicated that Falstaff's power could be used to force Kestenbaum to sell for less than fair market value to someone who was "compliant" with Falstaff's restrictive practices. Presumably a lower price would increase the purchaser's profitability and decrease his incentive to disobey Falstaff. Dr. Block made specific reference to adherence to territorial restrictions, and perhaps a connection could have been made to ceiling price restraints as well. In his view, the approval was an enforcement device which was unreasonable because of its use to further other anticompetitive conduct.

This theory of unreasonableness, however, rests on an assumption which this record can no longer support. Dr. Block assumed Falstaff depressed the price of Kestenbaum's business, and forced him to sell it for less than its fair market value.

That assumption is critical. There is no evidence that Falstaff refused Durr because it thought he was not "compliant." The evidence concerning Falstaff's purpose in not approving Durr was Donald Dowling's testimony that the territory Durr wanted was small, Falstaff thought Durr could not make a go of it if Kestenbaum was failing, and Falstaff preferred to add the territory to the responsibilities of well-established Falstaff distributors in neighboring counties. That is a good business reason, see *Kestenbaum*, 514 F.2d at 696, and evinces a procompetitive intent which is probative of a lack of anticompetitive effect. It placed on Kestenbaum an even greater burden of going forward with his compliance theory by showing that his selling price was depressed, and illegal restrictions were imposed on his purchasers.

Dr. Block and Kestenbaum reasoned that the selling price was depressed because Kestenbaum only got $30,000 for the goodwill of his business, when a fair value would have been, for Dr. Block, $70,000, or Kestenbaum, $49,000. As explained in *IV. Goodwill, infra*, both of those estimates were riddled with legal error. They cannot be given any probative value, yet their presence in the record inevitably prejudiced the jury's consideration of this sale of business issue. Exclude them, and the proof that the price was depressed all but vanishes. A new trial is necessary.

As a secondary matter, we note that the record contains little, if any, proof that illegal restrictions were imposed on Kestenbaum's purchasers. The stay competitive policy and the designation of areas of primary responsibility in the distributorship agreements were not illegal on their face. This defect in Kestenbaum's proof further weakens the record support for his coercion theory, and heightens the prejudice caused by the erroneous goodwill testimony.

In sum, the court erred in submitting Kestenbaum's general conspiracy theory to the jury, and because Dr. Block's and Kestenbaum's testimony was infected with error, we also reverse the jury's verdict that Falstaff's use of its approval power was unreasonable.

We turn to a discussion of the goodwill issue, and a consideration of Falstaff's other objections which may arise on retrial.

### IV. *Goodwill*

Businesses have a goodwill value when their earning power exceeds what might reasonably be expected based on the value of the capital and labor they employ. When that intangible earning power is capitalized, a single figure estimate for goodwill results.

Kestenbaum's business earned no profits at all when it was sold. He nevertheless received $30,000 for its goodwill, presuma-

bly because the purchasers expected to earn profits in the future. Both Kestenbaum and Dr. Block testified that figure was too low, principally because the allegedly illegal bar spending, local advertising, and warehouse expenses depressed Kestenbaum's net income. As indicated above, Kestenbaum failed to prove those requirements were wrongful. Even if anticompetitive effect were shown from the restraint on the sale of the business, the jury's $19,000 damage award to Kestenbaum for lost goodwill value could not stand.

At trial, Falstaff attacked the goodwill estimates on another ground by moving for a directed verdict based on a conflict between Kestenbaum's goodwill estimates and our prior opinion in this case. Falstaff's position was that the conflict made the estimates incompetent, and so the record lacked substantial evidence to support the damage claim. Falstaff also moved to exclude Dr. Block's goodwill estimate entirely.

In the prior opinion, we established specific elements which an estimate of goodwill must take into account. The trial judge, in the instruction quoted above, properly outlined those elements to the jury. They are widely approved. *See Standard Oil Co. v. Moore*, 251 F.2d 188, 219 (9th Cir. 1957), *cert. denied,* 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958); *Vandervelde v. Put and Call Brokers and Dealers Ass'n*, 344 F.Supp. 118, 150–151 (S.D.N.Y. 1972); Annot., 16 A.L.R.F. 14 at § 20; 5 Proof of Facts, *Goodwill* 507 (1960); W. Meigs, A. Mosich, C. Johnson & T. Keller, Intermediate Accounting 496 (3d ed. 1974). They are certainly the law of this case. *See Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 19 (5th Cir.), *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). When Kestenbaum sold his business, he recovered the value of his capital investment, and he took with him the worth of his own labor. Strict adherence to the indicated elements of goodwill proof was necessary to ensure he did not count a return from those sources as part of the goodwill he lost by selling the business, and so effect a double recovery.

Despite the commands of both law and logic, neither Dr. Block nor Kestenbaum made proper deductions in estimating goodwill value. Dr. Block did not take into account the $80,000 capital Kestenbaum had tied up in his business, even though a fair return on that sum would have made a significant dent in the $24,000 per year Dr. Block estimated Kestenbaum could have earned without Falstaff's restrictions. Dr. Block even went so far as to say the Court's formula did not apply to this case.

Kestenbaum also did not take into consideration a return on his capital. While Kestenbaum, like Dr. Block, did subtract for the $7,800 salary he earned from the business, Kestenbaum testified that the true value of his labor was in the order of $20,000. He did not account for that more generous sum. In our prior opinion, we held Kestenbaum was competent to give testimony on the goodwill value of his business, but indicated his testimony must be about "the sum of the above valuation elements." *Kestenbaum*, 514 F.2d at 698. Neither Kestenbaum nor Dr. Block heeded that admonition. The trial court erred in denying the motion for directed verdict and so allowing their goodwill testimony to go to the jury.

## V. *Other Alleged Errors*

Falstaff asserts that the trial court committed a number of other prejudicial errors. We disagree.

■ A. *Proposed Charge.* The trial court violated Fed.R.Civ.P. 51 by not supplying counsel with its proposed jury charge, or otherwise ruling on their requested instructions, prior to their arguments to the jury. When the court announced its intent to withhold the charge, however, Falstaff's counsel did not do anything "to indicate that [he] was not fully satisfied," *Dallas Railway & Terminal Co. v. Sullivan*, 108 F.2d 581 (5th Cir. 1940). The error did not deprive Falstaff of "substantial justice." *See Clegg v. Hardware Mutual Cas. Co.*, 264 F.2d 152, 157 (5th Cir. 1959) (citing Fed.R.Civ.P. 61); Wright & Miller, Federal Practice & Procedure § 2552 at 663 (1971). The only harm claimed by Falstaff

is that counsel wasted a few minutes of his argument rebutting territorial restriction allegations which the charge removed from the jury's consideration.

B. *Continuance.* Trial was set for October 5. On August 23 Falstaff filed interrogatories seeking the identity of any expert witness to be called by Kestenbaum and the substance and grounds for his testimony. Answers were due September 23. On September 7, Kestenbaum answered, saying no decision had been made concerning the hire of an expert "but such decision will be made within the forthcoming week" and further information was available "upon request." On September 8, Kestenbaum retained Dr. Block. On September 16, Kestenbaum moved to withdraw the record for Block's use, and so informed Falstaff that he had been hired. On September 22, Falstaff sought supplemental responses, and on September 28 the responses were filed. At trial on October 5, Falstaff made a motion to exclude Dr. Block's testimony or continue the case, and the trial judge denied it.

■ Falstaff objects that Kestenbaum's counsel violated his duty under Fed.R.Civ.P. 23(e)(1) seasonably to supplement his response which indicated no expert had been hired. We are mindful that a trial court's ruling on sanctions for failure to supplement answers will only be reversed when an abuse of discretion is shown. *Britt v. Corporacion Peruana De Vapores*, 506 F.2d 927, 932 (5th Cir. 1975); *see National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976).

■ Falstaff learned of Dr. Block's identity, and Kestenbaum's supplemental response was filed only five days after answers to the first interrogatories were due. Falstaff made no effort in the ensuing week to seek further answers or to depose Dr. Block. The supplemental response indicated Dr. Block's basic approach to the case, which was that absent coerced spending on advertising, bar spending, and warehouses, Kestenbaum's business would have had a

$60–70,000 goodwill value. Falstaff has not indicated any points which it was prevented from raising on cross-examination because of the asserted inadequacy of the supplemental response. On these facts, the trial judge did not abuse his discretion in denying Falstaff's motion.

■ C. *Dr. Block's Testimony.* On appeal, Falstaff asserts Dr. Block's testimony concerning the unreasonableness of the distributor agreement should have been excluded by the trial court. Dr. Block had only one month's exposure to the beer business, this was the only distributorship agreement he had seen, and he said he relied primarily on "principles of economics." Dr. Block did not confine his testimony to anticompetitive effect, and made prejudicial and irrelevant statements that the agreement was "unfair," "arbitrary," and "unduly restrictive."

A district judge's decision to allow expert testimony will not be overturned unless "manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 536 (5th Cir. 1974). Dr. Block did a study of the beer business, and talked to other beer distributors about their operations. His writings and academic credentials qualify him as an expert in the field. Falstaff's objections go to weight, not admissibility. *See Barnes v. General Motors Corp.*, 547 F.2d 275 (5th Cir. 1977). While we agree that some of Dr. Block's testimony was irrelevant, the legal issues were less than clear at the time of trial. Falstaff's brief cites no instance in which Falstaff moved to strike these objectionable statements by Dr. Block from the record. Our independent examination of the record reveals none. Especially in the absence of a precisely tailored objection, we cannot say the trial judge erred in allowing Dr. Block to offer his opinion.

■ D. *Exhibit 46.* Falstaff objects to the admission of Kestenbaum's exhibit which quantified his unnecessary warehouse expense. Because Kestenbaum prepared it from statements drawn by his accountant for this litigation, Falstaff main-

tains it is hearsay and is not a regularly maintained record admissible under Fed.R. Evid. 803(6). The exhibit, however, was part of the prior trial. It was offered as a summary of the records on which the accountant relied, and those records had long been available for examination by opposing counsel. It was admissible under Fed.R. Evid. 1006.

### VI.  *Disposition*

Kestenbaum has twice failed to sustain his position that a violation of the antitrust laws by Falstaff caused him damage. We nevertheless remand for a new trial. Our reversal of his present verdict is based in part on erroneous testimony, and we note that a new trial was the only post-verdict remedy which Falstaff sought in the district court. *See Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947); Fed.R.Civ.P. 50(b); 5A J. Moore, Federal Practice & Procedure ¶ 50.-12 (1977); *cf. Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 490, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

REVERSED AND REMANDED.